John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:    (212) 374-5401
Facsimile:    (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs and the Classes*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ANDREW HEIDEL, R. ANDREW HEIDEL INC.** d/b/a **THE WAY STATION, FRANKLIN ORTEGA, PO ITALIANISSIMO INC., JOHN MEROLLA,** and **NYMS PRODUCTIONS, INC.** d/b/a **MURDERED BY THE MOB,** individually and on behalf of classes of all others similarly situated,<br><br>Plaintiffs,<br><br>- against –<br><br>**ANDREW CUOMO, GOVERNOR OF NEW YORK STATE, IN HIS OFFICIAL CAPACITY, THE STATE OF NEW YORK, BILL** de **BLASIO, MAYOR OF NEW YORK CITY, IN HIS OFFICIAL CAPACITY,** and **THE CITY OF NEW YORK,**<br><br>Defendants. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs, on behalf of themselves and classes of similarly situated persons as defined below (the "Classes"), by their attorneys, Balestriere Fariello, for their claims

1

against Governor Andrew Cuomo in his official capacity as Governor of New York State, the State of New York (the "State Defendants"), Mayor Bill de Blasio in his official capacity as Mayor of New York City, and against the City of New York (the "City Defendants"), respectfully allege as follows upon information and belief, except as to allegations concerning Plaintiffs, which are made upon personal knowledge, and except as otherwise indicated herein.

## PRELIMINARY STATEMENT

### Violations of the Takings and Equal Protection Clauses

1.       This is a case about the government's response to a public health emergency that placed an unfair—and unconstitutional—burden on a subset of society: the small businesses, and the owners of those business, which most government leaders trumpet as "the backbone" of the local and national economy.

2.       Plaintiffs and the Classes they seek to represent—small businesses and small business owners in New York City and New York State—seek relief for two kinds of serious damages that they have suffered as a result of Defendants' potentially well meaning, but, in the end, impermissible government conduct: takings without compensation, and irrational differential treatment of businesses.

3.       As a result of Defendants' ostensibly well-meaning but nevertheless impermissible conduct, Plaintiffs and the many members of the Classes which they seek to represent did not merely suffer temporary restrictions on or slowdowns or stoppages of their business operations—many lost their businesses completely and permanently.

4.     In bringing about this result, Defendants crossed two fundamental constitutional lines: (1) they effected takings without compensation, and (2) they acted on the basis of an unequal, irrational, and arbitrary classification.

5.     The aim of the Takings Clause of the United States Constitution—which does not prohibit government takings, but requires just compensation when such takings occur—is to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

6.     By depriving small business owners of their livelihoods and causing the loss of their businesses, Defendants forced some people alone to bear burdens which in all fairness and justice should have been borne by the public as a whole.

7.     Defendants went further than violating the Takings Clause.  They also violated the Equal Protection clauses of both the United States and New York Constitutions. Defendants violated the Equal Protection Clause of the United States Constitution by creating a non-scientific, non-risk-based distinction between "essential" and "non-essential" businesses.

8.     Businesses deemed essential by the Defendants were largely free from closures and restrictions.  At the same time, many "non-essential" businesses were destroyed, and all were damaged in some fashion, by the Covid-19 related New York State Executive Orders Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency (the "State Orders") and New York City Emergency Executive Orders (the "City Orders"). The non-essential businesses which could not

succeed were overwhelmingly small, non-professional businesses such as restaurants, small theaters, bars, small event venues, independent movie theaters, and the like.

9.      Whatever Governor Cuomo's initial motives might have been behind the State Orders, he expressly admitted in October 2020 that Covid-19 restrictions imposed on New York State and New York City were not based on science or rationality, but were instead driven by fear and the purely political motive of being seen to be responding to public fear.

10.      As quoted more fully in paragraph 29, below, in a telephone conversation reported by the Wall Street Journal, Governor Cuomo admitted: "This is a fear-driven response. . . . This is a policy being cut by a hatchet. It's just very blunt. . . [I]t's out of fear. . . . I can tell you honestly the fear is too high to do anything" else.

11.      Defendants' irrational, fear-driven, non-scientific regulations further violated the Due Process Clause of both the United States and New York Constitutions by unjustifiably and wholly denying Plaintiffs and the Classes their right to pursue their profession and earn a livelihood.

12.      Solely for jurisdictional reasons, while Plaintiffs and the Classes prosecute claims under the Takings Clause against both the State and City Defendants, Plaintiffs and the Classes only bring equal protection and due process claims in this action against the City Defendants.

13.      While beyond the scope of this action, the State Defendants went even further than irrationally distinguishing between "essential" and "non-essential" businesses.

14.    Whatever the reason—whether, as frequently speculated in the press, due to a political rivalry between Governor Cuomo and Mayor de Blasio, or whether due to something else—the State Defendants engaged in a particularly damaging, and especially unscientific, geographic disparate treatment: the State Defendants treated, and still treat, New York City businesses and their indoor spaces differently than the identical businesses and indoor spaces outside of New York City.

15.    Even when applying the same health metrics based on the same data, the State Defendants have not permitted New York City businesses to operate with the same freedoms they could if those same exact businesses had been physically located in any of the other 57 counties in New York State.

16.    Indeed, without justification, the State Defendants treated and continue to treat New York City businesses differently than the same types of businesses operating in the counties bordering the City, and operating in those cities in the State which have sections as dense as certain sections of New York City.

17.    For example, the towns and villages of Kaser and Spring Valley in Rockland County; Bellerose, and Floral Park in Nassau County; and Kenmore in Erie County all have higher population densities than the New York City borough of Staten Island.  The same is true of the population density of the city of Yonkers. Yet the types of businesses which can operate with limited restrictions in those non-New York City communities are, in some cases, not even allowed to be open in New York City.

18.    Such geographic disparate treatment misconduct, while not a claim prosecuted here, again solely for jurisdictional reasons, shows the increasing lack of

reasonableness (and impermissibility) of aspects of the State and City Orders as the pandemic continued.

19.     The end result of the State and City Orders was the destruction of at least hundreds and more likely many thousands of businesses throughout New York City and New York State.

20.     Plaintiffs and the Classes thus seek recovery for the deprivations they sustained as a result of Defendants' conduct while those Defendants acted under color of State law against Plaintiffs and the Classes' rights and privileges guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

*The Pandemic Begins, and So Does the Extraordinary Government Action*

21.     The background is well known: when in March 2020 the Nation began to face a once-in-a-century pandemic, the State and City Defendants imposed restrictions pursuant not to legislative acts, but to State and City Orders, which had, especially at first, the laudable goal of protecting the public good and promoting public health.

22.     And, indeed, Plaintiffs and the Classes challenge a very limited portion of the State and City Orders. For example, Plaintiffs and the Classes do not seek to challenge mandates to wear masks, science based restrictions of occupancy numbers in internal spaces (as long as such rules are uniformly applied), social distancing requirements, and the like.

23.     Plaintiffs are not on a political mission, but are small business owners who have developed their businesses for decades only to see their businesses destroyed or

largely wiped out by the global burden that has been unfairly placed disproportionately on them.

24.     Politicians across the spectrum agree that Plaintiffs and members of the Classes are one of the core sectors, if not *the* core sector of our economy. "Small businesses are the backbone of our State's booming economy" (*Governor Cuomo Announces More Than $188 Million in Loans Provided to Small Businesses in 2018* (Dec. 27, 2018), https://www.governor.ny.gov/news/governor-cuomo-announces-more-188-million-loans-provided-small-businesses-2018.) "America's small businesses are the backbone of our communities." (*Remarks by President Trump at America CARES: Small Business Relief Update Meeting* (Apr. 7, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-america-cares-small-business-relief-update-meeting/.)

25.     And while governments worldwide needed to take extraordinary steps to protect the public, even in an emergency government authority is not without limit—not under the United States Constitution, nor under the New York State Constitution. Addressing some of the very State and City Orders at issue in this case, and finding that certain parts of such Orders should not be enforced, the Supreme Court itself very recently noted that, "even in a pandemic, the Constitution cannot be put away and forgotten." *R.C. Diocese of Brooklyn v. Cuomo*, No. 20A87, 2020 WL 6948354, at *3 (U.S. Nov. 25, 2020) ("*Brooklyn Diocese v. Cuomo*").

26.     This is only the most recent statement by the Supreme Court on this rule. Nearly nine decades ago, the Supreme Court reiterated the principle as old as the Nation

that even in difficult times, there are limits on government power: "The Constitution was adopted in a period of grave emergency. Its grants of power to the Federal Government and its limitations of the power of the States were determined in the light of emergency and they are not altered by emergency." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1934).

*The Government Admits the Orders are Not Rational*

27.    Indeed, simply as an example of how the New York State and City governments themselves understood that, over time, they wielded nearly unrestricted power over the everyday life of small businesses and all New Yorkers, on or around October 15, 2020, seven months into the enforcement of the first State and City Orders, Governor Cuomo acknowledged that the State and City Orders which he and Mayor de Blasio were issuing were likely overexpansive. (*See infra* ¶29.)

28.    Moreover, the Governor acknowledged that the State and City orders were at least in part, not based on science (notwithstanding months of data collected since spring 2020), but, instead, driven by fear. Even a cursory review of the State's testing abilities by October 2020 makes clear that a less restrictive approach—which would have damaged small businesses less, and which would more likely have conformed to constitutional limits—was possible. (*Id.*)

29.    In a call with religious leaders concerned about what they viewed as the targeting of certain establishments in their community, the Governor admitted:

> This is not a highly nuanced, sophisticated response. This is a fear-driven response. You know, this is not a policy being written by a scalpel. *This is a policy being cut by a hatchet*. It's just very blunt. I didn't propose this. It was proposed by

8

the mayor in the city. I am trying to sharpen it and make it better. But it's out of fear. . . .

Your point is right. 'Why close every school? Why don't you test the schools and close the ones that have a problem?' I know. First I don't know that we have the resources to do that now, but I can tell you honestly *the fear is too high to do anything other than 'Let's do everything we can to get the infection rate down now*. Close the doors. Close the windows.' That's where we are. (The Editorial Board, *Andrew Cuomo Takes a 'Hatchet'*, Wall Street Journal (Oct. 15, 2020), https://www.wsj.com/articles/andrew-cuomo-takes-a-hatchet-11602803166?st=ph5fcv5vw9fioji&reflink=article_email_share. (emphasis added).)

30.     By the date this conversation was reported, contrary to the Governor's assertion in this call, New York's testing ability was the envy of the Nation, with the State on many days testing more people per capita than any country in the world, including any other state.

31.     The Governor himself repeatedly acknowledged New York's testing and data collection abilities, including at about the time of this statement (*See. e.g.*, *New York Tops 500,000 Confirmed Covid Cases as U.S. Sees Fastest Spread Rate Since Spring* (Oct. 30, 2020), https://www.nbcnewyork.com/news/coronavirus/new-york-nears-a-half-million-confirmed-covid-cases-as-cluster-battle-continues/2691260/ .)

32.     Indeed, on the date the Governor's statement was reported, October 15, 2020, 136,039 people were tested for Covid-19 in New York State, exceeding, for example, the 92,325 tests taken that day in California, which has more than twice the population of New York State.

33.     The City and State Defendants needed to take decisive action.  But the United States and New York Constitutions put limits on such action—even in a pandemic. And such founding documents protect the small businesses who have unfairly

carried the City and State's burden, without compensation for their sacrifices for the good of society.

34.     Given all this, all the below allegations, and the full text and reports of the articles, essays, orders, and public statements and guidelines referenced below, Plaintiffs bring this lawsuit on behalf of themselves and the Classes for violations of their constitutional rights against takings without compensation, and to be treated equally under the law.

**JURISDICTION**

35.     Pursuant to 42 U.S.C. § 1983, this Court has jurisdiction to enforce the provisions of the U.S. Constitution.

36.     This Court has subject matter jurisdiction over the claims asserted by Plaintiffs under 28 U.S.C. § 1331 as this action involves claims based upon the Fifth and Fourteenth Amendments of the U.S. Constitution and seeks to prevent Defendants from interfering with federal rights secured by the U.S. Constitution.

37.     Pursuant to 28 U.S.C. § 1343(a)(3) and (4), this Court has subject matter jurisdiction over the claims asserted by Plaintiffs as this action is brought to redress deprivations under color of State law, statute, executive order, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the U.S. Constitution.

38.     This Court has jurisdiction over the Plaintiffs' federal takings, equal protection, and substantive due process claims against the City Defendants under 42 U.S.C. § 1983.

39.     This Court has supplemental jurisdiction over the New York State Constitutional claims under 28 U.S.C. § 1367(a) as the claims are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

40.     This Court has jurisdiction over Plaintiffs' takings claims against the State Defendants because Plaintiffs and the Classes have no adequate, effective, reasonable, or certain remedy for these claims in state court.

41.     The Takings Clause of the U.S. Constitution is self-executing, requiring states to provide adequate, effective state court takings remedies notwithstanding any right to sovereign immunity such states might otherwise possess in other contexts.

42.     Here, the only adequate, effective remedy is a class action because for Plaintiffs and most, if not all, of the small-business-owning members of the Classes, individual suits are not economically feasible.

43.     Indeed, many Class members are currently out of business or without resources such that prosecuting a claim as an individual plaintiff is genuinely impossible.

44.     However, New York law prevents Plaintiffs and the Classes from bringing this class takings action against New York State in any State court.

45.     Since New York State does not provide an adequate, effective state court takings remedy, sovereign immunity does not bar this suit, and this Court therefore has jurisdiction.

## VENUE

46.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York because a substantial part of the events giving rise to claims set forth in the Complaint have already and will occur in this district.

## PARTIES

*Plaintiffs*

47.      Plaintiffs are businesses and their owners in the City of New York.

48.      R. Andrew Heidel Inc. d/b/a The Way Station ("The Way Station"), which opened on February 23, 2011 and was continuously in business until it closed on March 17, 2020, was formerly located on 683 Washington Ave, Brooklyn, New York 11238. It was owned by Andrew Heidel ("Andy").

49.      PO Italianissimo Inc. ("Italianissimo Ristorante"), which originally opened in 1996, was acquired by Franklin Ortega on October 31, 2006, is located on 107 McClean Avenue, Staten Island, New York 10305.  It is owned by Franklin Ortega.

50.      NYMS Productions, Inc. d/b/a Murdered by the Mob ("Murdered by the Mob"), which originally opened in 1992, was acquired by John Merolla and Michael Morana on January 6, 2014, was continuously in business until it closed on March 14, 2020, and was formerly located on 141 West 38th Street, New York, New York, 10018.  It was owned by John Merolla and Michael Morana.

51.      Plaintiffs invested tremendous financial resources, time, and effort into their businesses, including, but not limited to, the purchase or lease of commercial real property; the purchase or lease of equipment, inventory, and physical business facilities;

advertising; training and hiring of employees; generally years of developing a customer basis and relationships with vendors and other business partners; and a host of other expenses such as rent or loan payments, professional services, and more.

*Defendants*

52.     Defendant Governor Andrew Cuomo ("Governor Cuomo") is and was the Governor of the State of New York and is and was acting under color of State law and in his official capacity, at all times relevant to the allegations made by Plaintiffs herein. Cuomo's principal place of business is located at the State Capitol Building, Albany, New York 12224.

53.     Defendant State of New York (the "State"), represented by and through its Attorney General, is a sovereign state of the United States of America.

54.     Defendant Bill de Blasio ("Mayor de Blasio") is and was the Mayor of the City of New York and is and was acting under color of City law and in his official capacity, at all times relevant to the allegations made by Plaintiffs herein. De Blasio's principal place of business is at City Hall, New York, New York 10007.

55.     Defendant the City of New York (the "City") is a municipal corporation within the State of New York.

## CLASS ACTION ALLEGATIONS

56.     Plaintiffs represent the three Classes prosecuting the claims here, which are the State Class, the City Takings Class, and the City Equal Protection Class, as defined below, all bringing their claims pursuant to Federal Rule of Civil Procedure ("Rule") 23(a) and (b).

**The State Class**

57.     Plaintiffs bring this class action on behalf of themselves and the class of all persons in the State of New York that held interests in commercial real property and were permanently deprived of all economically viable use of their property as a result of the State Orders (the "State Class").

58.     The State Class includes, but is not limited to, the following:

(a) All persons in the State of New York who held interests in commercial real property and whose businesses went out of business, were liquidated, became insolvent, or were rendered bankrupt as a result of the State Orders;

(b) All persons in the State of New York who leased commercial real property for which the lease expired during the period when the State Orders were in effect and that did not have any economically viable use as a result of the State Orders; and

(c) All persons in the State of New York who leased commercial real property at the time the State Orders were first enacted who, as a result of the closure or restrictions on the use of their property mandated by the State Orders, suffered a total loss of the market value of their remaining leasehold.

**The City Takings Class**

59.     Plaintiffs bring this class action on behalf of themselves and the class of all persons in the City of New York that held interests in commercial real property and were permanently deprived of all economically viable use of their property as a result of the State and City Orders (the "City Takings Class").

60.     The City Takings Class includes, but is not limited to, the following:

(a) All persons in the City of New York who held interests in commercial real property and went out of business, were

liquidated, became insolvent, or were rendered bankrupt as a result of the State and City Orders;

(b) All persons in the City of New York who leased commercial real property for which the lease expired during the period when the State and City Orders were in effect and that did not have any economically viable use as a result of the State and City Orders; and

(c) All persons in the City of New York who leased commercial real property at the time the State and City Orders were first enacted who, as a result of the closure or restrictions on the use of their property mandated by those Orders, suffered a total loss of the market value of their remaining leasehold.

**The City Equal Protection Class**

61.     Plaintiffs bring this class action pursuant to Rule 23(a) and (b) on behalf of themselves and the class of all persons in the City of New York that owned non-essential businesses when such non-essential businesses could have been open or otherwise operated more expansively but for their categorization as "non-essential" under the State and City Orders ("the City Equal Protection Class").

62.     The City Equal Protection Class includes, but is not limited to, restaurants, bars, malls, gyms, and movie theaters and their owners.

63.     Plaintiffs and the three Classes seek compensatory damages, attorneys' fees, costs, expenses, and any further relief this Court deems just and proper.

**All Requirements of a Class Action are Met Here**

64.     This action meets the following requirements of Rule 23(a) pursuant to which Plaintiffs may bring this action on behalf of the Classes:

(a) **Numerosity**: Upon information and belief, the Classes include hundreds, if not thousands, of members and consist of geographically

dispersed persons. Due to the high number of members of all three Classes, joinder of all members is impracticable and, indeed, virtually impossible, particularly as many members of the Classes are no longer operating.

(b) **Commonality**: A substantial pool of questions of law and fact exists among the Classes, including but not limited to issues such as,

(i) The actions taken by Defendants in response to the Covid-19 pandemic;

(ii) The content of the State and City Orders;

(iii) Implementation by Defendants of the State and City Orders;

(iv) The irrationality and arbitrariness of particular provisions of the State and City Orders;

(v) The lack of necessity for particular provisions of the State and City Orders;

(vi) Whether a business owner who, as a result of Defendants' actions, was permanently deprived of all economically viable use of his property and permanently lost his business and/or lost all market value of his remaining leasehold has suffered a per se, categorical taking;

(vii) Whether Defendants, through the State and City Orders, violated the Takings Clause of the U.S. Constitution;

(viii) Whether the Defendants, in particular the City Defendants, through the State and City Orders, violated the Equal Protection and Due Process Clauses of the U.S. Constitution and the Equal Protection Clause of the New York State Constitution; and

(ix) Whether Defendants engaged in this conduct without just compensation to Plaintiffs and the members of the Classes.

(c) **Predominance**: The questions of law or fact common to members of the Classes, which determine the violation of the constitutional rights of the Classes' members, and the liability of Defendants to the Classes' members, predominate over any questions affecting only individual

members, which concern only the amount of damages suffered by each Class member.

(d) **Typicality**: Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs are businesses and business owners in the City of New York, whose businesses were treated differently than similarly situated businesses, and/or whose businesses either went out of business or whose businesses and commercial real property were rendered unprofitable, and/or who were deprived of all economically beneficial use of their commercial real property as a result of the State and City Orders. The harm suffered by Plaintiffs and the causes of such harm is representative of the respective Classes. The claims or defenses of the Plaintiffs and the Classes arise from the same events and actions by the Defendants and are based on the same legal theory.

(e) **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs do not have any interests that conflict with the interests of the members of the Classes. Plaintiffs have engaged competent counsel who are experienced in complex litigation, including class action litigation and public focused litigation, to represent the Classes.

(f) **Superiority**: A class action is superior to alternatives, if any, for the timely, fair, and efficient adjudication of the issues alleged herein because:

  (i) A class action will permit numerous similarly situated persons to prosecute their common claims in a single forum simultaneously, without duplication of evidence, expense, and resources;

  (ii) The individual amount of restitution involved for some Class members renders individual remedies impracticable and individual litigation too costly if not impossible, in particular for those members of the Classes that are no longer in business;

  (iii) This action will result in uniformity of decisions and avoid risk of inconsistency and incompatible standards of conduct in the judicial system; and

  (iv) Individual actions would unnecessarily burden the courts and waste judicial resources.

## STATEMENT OF FACTS

### The State and City Governments Issue a Series of State and City Orders

65.     The laws at issue here were passed by neither the New York State Legislature nor the New York City Council.  Instead, Defendants Governor Cuomo and Mayor de Blasio issued State and City Orders that heavily restricted the businesses in the Classes.

66.     Specifically, Governor Cuomo issued the State Orders, implemented by Mayor de Blasio on and after March 12, 2020.

67.     Mayor Bill de Blasio, in turn and of his own accord, issued guidance thereunder the State Orders, and his own City Orders on and after March 15, 2020.

68.     The first pandemic related orders were issued several days before the first State Orders and City Orders at issue in this case.

69.     Specifically, on March 7, 2020, Governor Cuomo issued State Order 202 which, in relevant part, declared a State Disaster Emergency for the State of New York based on the fact that travel-related and community contact transmission of Covid-19 had been documented in New York State, and that similar declarations had previously been made by the World Health Organization and the United States Health and Human Services Secretary Alex M. Azar II.

70.     The next week, March 12, 2020, State Order 202.1 canceled or postponed any gathering or event in excess of 500 persons, including closing all theaters in New York City seating 500 or more attendees.

18

71.     Between March 7, 2020, and April 7, 2020, Governor Cuomo issued and the State implemented a series of State Orders from 202.1 through 202.14 which successively closed or restricted businesses in the State of New York ("New York State on PAUSE").

72.     At about the same time, on March 8, 2020, Defendant Mayor de Blasio banned "non-essential" business travel of employee of City agencies with City Order 55 and on March 12, 2020, declared a local state of emergency in New York City in response to the Covid-19 pandemic.

73.     Defendant Mayor de Blasio then, on March 15, 2020, signed City Order 99, which immediately canceled all gatherings in excess of 500 people and capped the capacity of all food and drink places to 50 percent. It was policed under violation of occupancy laws, and people knowingly violating the provision were guilty of a Class B misdemeanor.

74.     Soon after, on March 16, 2020, Mayor de Blasio signed City Order 100, which immediately ordered food and drink establishments to only allow takeout and delivery. The New York Police Department issued Class B misdemeanor summonses under this City Order. This City Order was extended every five days (City Orders 101–125) until it was modified by City Order 127, which amended City Order 100 and City Order 102. Violations of City Order 100 violated N.Y.C. Fire Code § 107.6, N.Y.C. Admin. Code § 15-227(a), N.Y.C. Admin. Code § 28-201.1, N.Y.C. Admin. Code § 3-108, and Exec. Law § 24.

75.     Concurrently, on March 16, 2020, Cuomo signed State Order 202.3, which ordered restaurants to cease serving patrons food and drink for on premise consumption at 8:00 p.m. Casinos, gyms, and movie theaters also ceased operations at 8:00 p.m.

76.     On March 17, 2020, Defendant de Blasio signed City Order 101 which banned all ride sharing. He also warned New York City residents that he intended to announce a "shelter-in-place" policy.

77.     Commenting on their evolution over time once parts of certain orders were found void by the Supreme Court of the United States in *Brooklyn Diocese v. Cuomo*, former federal judge, law professor, and director of the Constitutional Law Center at Stanford Law School Michael McConnell and NYU Law Professor Max Raskin noted, "The [New York State Executive Order] restrictions, which are far more draconian than those approved by the court in the earlier cases [in earlier 2020], are both extraordinarily tight and essentially unexplained." (Michael McConnell and Max Raskin, The Supreme Court was Right to Block Cuomo's Religious Restrictions (Dec. 1, 2020), https://www.nytimes.com/2020/12/01/opinion/supreme-court-Covid-19-religion.html.)

### Defining Essential vs. Non-Essential Businesses Without Regard to Risk, And Without Due Process

78.     On March 18, 2020, in State Order 202.6, Defendant Governor Cuomo established categories of "essential" and "non-essential" businesses.

79.    "Essential businesses" were subject to neither the in-person restrictions of State Order 202.06 nor the closings and in-person restrictions of subsequent State or City Orders.

80.    Pursuant to Defendant Governor Cuomo's State Orders, the State-controlled Empire State Development Corporation ("ESD") issued guidance, which set forth certain industries which the ESD deemed "essential," on behalf of Governor Cuomo, and which were therefore permitted to remain in operation during the Covid-19 pandemic.

81.    Each "non-essential" employer was required to reduce the in-person workforce at any work location by 50 percent by no later than March 20, 2020 at 8 p.m.

82.    The closings and restrictions became progressively more extensive and restrictive until, on March 20, 2020, State Order 202.8 required that

> Effective on March 22 at 8 p.m.: All businesses and not-for-profits entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m. . . . Any business violating the above order shall be subject to enforcement as if this were a violation of an order pursuant to section 12 of the Public Health Law.

83.    Subsequent City Orders signed on March 20, 2020, and March 25, 2020, further reduced the in-person workforce by 75 percent and 100 percent respectively. (City Order 102 and 103.)

84.    State Order 202.6 also purported to establish a procedure under which any business could be deemed "essential" at the direction of the ESD.

85.     This inherently limited procedure did not, in fact, provide effective and timely economic, post-deprivation relief to the members of the Classes.

86.     All businesses operating out of compliance with the State Orders were subject to fines and penalties. (*See* State Order 202.14.)

87.     The State Orders were enforced in New York City by City employees, including the New York City Police Department.

88.     Indeed, the State Orders were generally enforced by local leaders throughout the State, and not simply in New York City.

89.     Simply as an example, at about the time Governor Cuomo and Mayor de Blasio were considering restrictions on so-called "hot spots" in Brooklyn, on October 14, 2020, Governor Cuomo stated, "if the local government does not effectively enforce the law, we will withhold funds from the local government." (Zack Fink, Governor Cuomo Threatens to Withhold State Funds over COVID Enforcement, Spectrum News (Oct. 14, 2020), https://www.ny1.com/nyc/all-boroughs/news/2020/10/14/governor-cuomo-threatens-to-withhold-state-funds-over-covid-enforcement.)     Defendant Governor Cuomo was specifically referring to what he called the "lax" policy that Mayor de Blasio had taken on masks and social distancing enforcement. (*Id.*)

90.     On March 20, 2020, Defendant Mayor de Blasio signed City Order 102, which closed all malls, and public entertainment, and ordered "non-essential businesses" to reduce their in-person workforce by 50 percent and then 75 percent by March 20 and March 21 respectively.

91.     Defendant Mayor de Blasio's City Order likewise provided that "essential businesses" were businesses which have "been designated as essential by the Empire State Development Corporation pursuant to Governor's Executive Order 202.6 or designated as essential pursuant to any subsequent orders issued by the Governor." (City Order 102.)

92.     With City Order 102, Defendant Mayor de Blasio also joined his support for the State Orders stating that "this Order incorporates any and all relevant provisions of Governor Executive Order No. 202 and subsequent orders issued by the Governor of New York State to address the State of Emergency declared in that Order pursuant to his powers under § 29-a of the Executive Law." Each subsequent City Order included this language.

93.     Absent from the State and City Orders, or any other executive orders issued by Governor Cuomo or Mayor de Blasio, is any provision addressing the inherent financial burden inflicted by the State and City Orders on individuals and businesses throughout New York, which is a direct result of the mandated shutdowns.

94.     Defendants did not provide any procedure to allow relief for the Class members whose businesses could not survive the prolonged closings and restrictions so as to avoid a complete deprivation of all economically beneficial use of their properties. Nor did Defendants provide a procedure to allow class members simply to be treated like other businesses which were considered essential, or, in some cases, which simply were not in New York City.

95.     As a general matter, "essential businesses" have been able to operate largely unfettered by government restriction—with generally no limits on occupancy of indoor space, nor restriction on entry to ostensibly healthy individuals, nor requirements that entrants provide information for contact tracing purposes.

96.     On the other hand, when "non-essential" businesses were slowly permitted to reopen, such restrictions did apply to them for seemingly sensible risk minimization reasons.

97.     Yet, such risk minimization reasons did not and to this day generally do not apply to essential businesses.

98.     The consequence of this arbitrary differential treatment of indoor establishments is that a feverish, coughing person could from the earliest days of the pandemic enter a supermarket, and stay as long as she wished, and be a part of a growing crowd in such supermarket, even though similar conduct, or much lower risk conduct (mask wearing, limited numbers indoor, and so forth) would not ever be permitted in any business decreed by the governments to be "non-essential."

99.     Commenting on the filings in the Supreme Court in *Brooklyn Diocese v. Cuomo*, former Judge McConnell and Professor Raskin noted that "'essential' businesses—a broad category that includes everything from big-box retailers to pet shops to lawyers' offices—may remain open without capacity limitations. One reads the parties' briefs in vain for a cogent explanation of the difference in treatment" between "essential" businesses and the religious institutions which the State and City Orders applied to.

100.    Addressing directly the point that "essential" as compared to "non-essential" is not a risk based distinction, the professors wrote, "[C]ustomers are not the only members of the public who matter. The workers at stores and factories [kept open as essential] are exposed to every single customer and co-worker who enters, and they remain for an entire workday in the same indoor space, often not effectively socially distanced." (McConnell & Raskin, *supra*.)

101.    Moreover, the Defendants' application of actual risk minimization procedures once non-essential businesses were permitted in some fashion to open shows that such procedures could have, and can be, applied to members of the Classes as well in order to achieve the legitimate goal of reducing Covid-19 spread, but without running afoul of the constitutional protections enjoyed by all New Yorkers and Americans, including members of the Classes.

**The State Begins to Allow Openings in a Seemingly Data Driven Manner—But Then Does So in a Way That Discriminates Against New York City**

102.    On May 11, 2020, Defendant Governor Cuomo announced a plan under which "New York will reopen on a regional basis as each region meets the criteria necessary to protect public health . . . [u]nder New York Forward, we can keep ahead of the virus, reopening our economy with a deliberative, data-driven strategy to protect the health and safety New Yorkers and be ready if and when a second wave of the virus hits." (*NY Forward: A Guide to Reopening New York & Building Back Better* (May 11, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/NYForward ReopeningGuide.pdf.)

103.    According to New York Forward and its implementation State Orders, "state and local officials will monitor four core factors to determine if a region can reopen. The loosening of restrictions in New York State will be considered on a regional basis, based on the following criteria. These criteria are designed to allow phased re-openings to begin in each region only if:

> • The infection rate is sufficiently low;
>
> • The health care system has the capacity to absorb a potential resurgence in new cases;
>
> • Diagnostic testing capacity is sufficiently high to detect and isolate new cases; and
>
> • Robust contact-tracing capacity is in place to help prevent the spread of the virus." (*Id.*)

104.    This phased reopening resulted in staggered openings of different regions of New York State and a staggered lifting of the restrictions under New York State on PAUSE. There were four Phases in New York Forward.

105.    New York City was the last region to enter Phase 1, the least restrictive phase, of the reopening plan, and did so on June 8, 2020. (*Governor Cuomo Announces New York City to Enter Phase 1 of Reopening on June 8* (May 29, 2020), https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-city-enter-phase-1-reopening-june-8-and-five-regions-enter.)

106.    At first, and contrary to the State Defendants' decision-making criteria in the initial State Orders, the phased reopening was based on science and treated

businesses and regions the same, not with regard to any vague, arbitrary notion of essentiality, but to risk of Covid-19 spread. (*NY Forward*, *supra*.)

107.    However, this changed. Despite the supposed "deliberative, data-driven strategy" set out in New York Forward and although New York City had met the metrics for each Phase, affected businesses in New York City were subjected to greater restrictions and longer closings than affected businesses in other regions that were in the same Phase under New York Forward. (*Governor Cuomo Announces New York City Enters Phase III of Reopening Without Indoor Dining and Subject to State Guidance Today* (July 6, 2020),    https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-city-enters-phase-iii-reopening-without-indoor-dining-and.)

108.    Just as the distinction between essential and non-essential businesses does not appear to be based on true risk assessments, no data-supported, rational basis was provided for subjecting the affected businesses in New York City to greater restrictions and longer closings.

109.    Indeed, commenting on the *Brooklyn Diocese v. Cuomo* case, Professors McConnell and Raskin asked, "Why are governments still picking and choosing among constitutional rights without explaining their reasoning?" (McConnell & Raskin, *supra*.)

110.    **Restaurants and bars**: Under State Order 202.41, the rest of New York State reopened indoor dining in Phase 3 between June 11, 2020, and June 24, 2020, with Long Island on June 24, 2020.

111.    On June 24, 2020, when indoor dining had reopened in every region except New York City, the positive test rate in New York City was lower than the rate in the

Finger Lakes and Mohawk regions. (*Governor Cuomo Announces Hospitalizations Drop below 1,000 for First Time since March 18* (June 18, 2020), https://www.governor.ny.gov/news/governor-cuomo-announces-hospitalizations-drop-below-1000-first-time-march-18-0.)

112.    When Defendant Governor Cuomo announced on July 6, 2020, in State Order 202.48, that New York City had entered Phase 3 of New York Forward, indoor dining was not permitted to reopen in New York City. (*Governor Cuomo Announces New York City Enters Phase III of Reopening Without Indoor Dining and Subject to State Guidance Today, supra*.)

113.    Although New York City had met the metrics for Phase 3 on July 6, 2020, indoor dining in New York City was not permitted until September 30, 2020. (*See* State Order 202.68.)

114.    In addition, New York City businesses were only allowed to open for indoor dining at 25 percent of capacity on September 30, 2020, while businesses in other regions were allowed to open for indoor dining at 50 percent of capacity. (*Id*.)

115.    New York City restaurants and bars were treated differently even though the same risk measures which apply to any indoor facility, such as restricted numbers of individuals in the facility at any one time, ventilation measures, and gating procedures (such as temperature taking and requiring contact information for contact tracing), could be applied universally. (*See Interim Guidance for New York City Indoor Food Services During The Covid-19 Public Health Emergency* (Sep. 11, 2020),

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/NYC_Indoor

_Food_Services_Detailed_Guidance.pdf.)

116.    In other words, even though there is no difference in the risk of Covid-19

transmission between an indoor restaurant in Buffalo and one in Brooklyn, or a bar in

Rochester and a bar on Staten Island, the establishments in New York City were treated

differently under law without rational basis.

117.    The New York City restaurant and bar industry—a substantial part of the

Classes, but hardly constituting all members of the Classes—has suffered catastrophic

losses as a result of the State and City Orders.

118.    As many as 50 percent of New York City bars and restaurants either closed

or faced closure as a result of the State and City Orders and the delayed phased reopening

for New York City. (Office of the N.Y. State Comptroller, The Rest. Indus. in N.Y.C.:

Tracking the Recovery, at 6 (2020).)

119.    **Malls:** In every region of New York State but New York City, malls were

allowed to reopen on July 10, 2020, if the region met the metrics for Phase 4. New York

City met the Phase 4 metrics on July 20, 2020, but malls in New York City were not

permitted to reopen until September 9, 2020, almost two months later than similarly

situated malls in the rest of New York State. (*See* State Order 206.60; State Order 206.68.)

120.    As with restaurants and bars, there is no difference between how an indoor

mall in Queens could cause the spread of Covid-19 compared to an indoor mall in

Syracuse. Yet, malls were treated differently between the two regions, without rational

basis.

121.    **Movie theaters:** Movie theaters in the rest of New York State were permitted to open on October 23, 2020, as long as the county in which they were located did not have any Covid-19 clusters (which New York, Bronx, and Richmond counties did not have) and the county had a Covid-19 positivity rate of less than two percent on a 14-day average (which was also the case in those three counties). (Covid-19 7 Day Average by Zip Codes in New York City, October 23, 2020.)

122.    Movie theaters in New York City are still closed. (See State Order 202.7.)

123.    Again, as with other indoor space establishments, the same risk mitigation procedures and rules can apply to a movie theatre in the Bronx as they would apply in Saint Lawrence County, yet, without rational basis, the State Orders, as implemented by the City Orders, treat movie theaters differently between regions.

### No Rational, Legally Permissible Reasons Given for Disparate Treatment

124.    As there is no rational basis for permitting "essential" businesses to be open in a high risk manner, while not permitting "non-essential" businesses to open even with risk minimization procedures, there is no rational basis for the differences in the treatment of the affected businesses in New York City and those in the rest of New York State.

125.    The media has speculated that, due to Governor Cuomo and Mayor de Blasio's political rivalry, Governor Cuomo sought to undermine and harm Mayor de Blasio. (Jesse McKinley, Luis Ferre-Sadurni, Dana Rubinstein and Joseph Goldstein, *How a Feud Between Cuomo and de Blasio Led to a Chaotic Virus Crackdown,* N.Y. Times (Oct. 12,

2020),          https://www.nytimes.com/2020/10/12/nyregion/cuomo-coronavirus-orthodox-shutdown.html.)

126.    If this speculation is accurate, it is not a rational, legally permissible basis for treating establishments in New York City differently.

127.    Defendant Governor Cuomo has sought to justify the differing treatment of New York City and the rest of New York State by stating that "they're different demographically, they're different by population, they're different by density, they're different by crowding factor." (*NY Gov. Andrew Cuomo Conference Call Transcript August 19,* Rev (August 19, 2020), https://www.rev.com/blog/transcripts/ny-gov-andrew-cuomo-conference-call-transcript-august-19.)

128.    However, at the time of the statement, New York City and, for example, Long Island had comparable Covid-19 "positivity rates" (the percentage of those tested for Covid-19 who tested positive) of between 0.8 percent and 0.9 percent. (*Governor Cuomo Announces Infection Rate Below 1 Percent for Tenth Straight Day* (Aug. 17, 2020), https://www.governor.ny.gov/news/governor-cuomo-announces-covid-19-infection-rate-below-1-percent-tenth-straight-day.)

129.    Moreover, while it is unclear what "different demographically" means, at least with regard to the spread of Covid-19, parts of New York City have the same density and crowding factors as other regions in New York State.

130.    For example, eastern Queens largely resembles Nassau County. The Northern Bronx largely resembles Westchester. Certain cities in Westchester, such as Yonkers, New Rochelle, and White Plains, have many areas with higher urban densities

than parts of Staten Island and even southern Brooklyn. And as noted above, there are many communities in New York State which have higher urban densities than the entire borough of Staten Island, where nearly half a million New Yorkers reside.

131.    In any event, with regard to the regulation of indoor spaces, outdoor population density is irrelevant. Even in Manhattan, indoor spaces can be treated the same way as similar indoor spaces outside of Manhattan.

132.    Scientific evidence goes against Defendants' stated reasons for their disparate treatment orders.

133.    For example, a Johns Hopkins study, released two months *prior* to Governor Cuomo's August 19, 2020 statement, found that denser communities tended to have lower death rates and that density is "unrelated to confirmed virus infection rates and inversely related to confirmed COVID-19 death rates." (*Urban Density Not Linked to Higher Infection Rates – and is Linked to Lower COVID-19 Death Rates,* (Jun. 18, 2020), https://www.jhsph.edu/news/news-releases/2020/urban-density-not-linked-to-higher-coronavirus-infection-rates-and-is-linked-to-lower-covid-19-death-rates.html.)

134.    In addition, as long as affected businesses comply with New York reopening guidelines, merely having dense urban spaces outside of the affected businesses does not create a greater risk of Covid-19 transmission inside the spaces of the affected businesses.

135.    If anything, outdoor dining—which Defendants have permitted and encouraged—has arguably created more pedestrian traffic. (Teo Armus, *As maskless New Yorkers crowd outside bars, Cuomo threatens to shut the city back down,* The Washington Post

(June 15, 2020), https://www.washingtonpost.com/nation/2020/06/15/ny-bars-reopen-cuomo/.)

136. Defendants, who have permitted and even encouraged outdoor dining (which is not a permanent feature of New York City street life), thus acknowledge that higher pedestrian traffic in New York City *outside* cannot be a rational, science based reason for regulating spaces in New York City which are *inside*.

137. Moreover, Defendants' reopening guidelines require a uniform standard of social distancing. Just as indoor spaces are the same in all of New York State's 62 counties, and not somehow different in Queens than they are in Nassau County, six feet of distance is the same in the Adirondacks and Manhattan, and 25 percent capacity is the same in the Southern Tier and the Bronx.

138. Yet, if a New York City restaurant opened its doors before September 30, 2020, it would be fined when a restaurant in every other region of New York after June 24, 2020, was permitted to open, even if the New York City restaurant was objectively safer according to Defendants' own criteria.

139. Further, movie theaters continue to be closed even though they present a safer environment in terms of the risk of Covid-19 spread than other currently open businesses.

140. For example, restaurants and bars, where patrons are eating, speaking, and drinking without masks, are allowed to be open, yet, movie theaters remain closed despite the fact that movie watching is a silent activity, where social distancing practices can easily be imposed by blocking off certain rows and seats, patrons can all wear masks,

and are all facing the same direction—all factors which have been proven to reduce transmission risk.

141.    Writing about theaters, University of California at Davis Health Expert and Professor Natascha Tuznik opined months ago that "now that masks are required. . . a theatre should pose less risk of person-to-person transmission than many other places people are going now." (*Movie theatres may pose less COVID-19 risk than we think, says UC Davis Health Expert* (Jun. 22, 2020), https://health.ucdavis.edu/health-news/newsroom/movie-theaters-may-pose-less-covid-19-risk-than-we-think-says-uc-davis-health-expert/2020/06.)

142.    Moreover, efficient and effective air filtration systems have been proven to be more effective in preventing the transmission of airborne diseases than restrictions on occupancy or density.

143.    For example, in airplane travel, a high-density activity, the air is refreshed in the cabin with filtered and outside air every two to four minutes. When testing the effectiveness of such filtration systems in preventing transmission of airborne diseases, a 2018 study, conducted without masks, found that a passenger infected with influenza was unlikely to infect someone outside of a two-seat radius. (Vicki Stover Hertzberg, et al., *Behaviors, movements, and transmission of droplet-mediated respiratory diseases during transcontinental airline flights,* 115 Proceedings of the Nat'l Acad. of Sciences of the United States of America 3623, 3623–3627 (2018).)

144.    Defendants—who have at times required sensible, science based risk minimization procedures, but then have not in the ways complained of here—themselves

34

understand the importance of air filtration.  Defendants have mandated air filtration requirements for gyms, restaurants, and movie theaters for those establishments to reopen.  Specifically, such establishments must have at minimum MERV-13 HVAC air filters in their indoor areas, and documentation proving that the building's air filtration system is certified by an HVAC technician.[1] Such provisions could apply to "non essential" businesses, or businesses generally in New York City which were not permitted to open, but Defendants—without reasonable basis—have refused to apply these measures which could enable many members of the Classes to have opened their businesses.

145.    The Supreme Court itself, opining on the State orders issued by the State Defendants, noted that less restrictive rules, such as limiting the size of gatherings rather than completely shutting down indoor spaces, can be adopted. *R.C. Diocese of Brooklyn,* 2020 WL 6948354, at *2.

146.    As such, Defendants have *arbitrarily* restricted the opening of certain businesses as the important factor is not the type of business, nor occupancy, nor density of the business, nor residency in New York City, but the adequacy of risk minimization procedures, such as mask mandates, social distancing requirements, cleaning protocols, or air filtration systems.

---

[1] *Interim Guidance for New York City Indoor Food Services During The Covid-19 Public Health Emergency* (Sep. 11, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/NYC_Indoor_Food_Services_Detailed_Guidance.pdf; *Reopening New York: Movie Theatre Guidelines for Employers and Employees* (Oct. 19, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Movie_Theater_Summary_Guidelines.pdf; *Interim Guidance: What Gyms and Fitness Center Operators Need to Know* (Oct. 29, 2020), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/businesses/covid-19-reopening-gyms.pdf.

147.    The unassailable, non-political, and genuinely rational point is that indoor space is the same wherever it is, and social distancing can be the same wherever a space is.  The disparate treatment of the State and City Orders are impermissible.

### Disparate Treatment by Hot Zone in Autumn

148.    After discriminating against "non-essential," and then New York City resident businesses for months, and effecting takings without compensation on many thousands of businesses State-wide, in the fall, Defendants extended some of their unfair disparate treatment.

149.    On October 5, 2020, Defendant Mayor de Blasio announced a plan to close businesses and schools in nine New York City zip codes, pending approval from Defendant Governor Cuomo. (NBC N.Y., *NYC Mayor De Blasio Holds Daily Briefing*, YouTube (Oct. 5, 2020), https://youtu.be/EMwttunav7E.)

150.    In response to Defendant Mayor de Blasio's zip code plan, Defendant Governor Cuomo, instead through State Order 202.68, issued on October 6, 2020, which established "red," "orange," and "yellow" zones (the "hot zones") with "enhanced public health restrictions based upon cluster-based cases of Covid-19 at a level which compromises the State's containment of the virus." (State Order 202.68.)

151.    Defendant de Blasio incorporated Defendant Cuomo's State Order 202.68 in City Order 152.

152.    This creation of "hot zones" in certain areas of New York City—while seeming to be based on science, as it should have been more than seven full months into the pandemic—is in fact arbitrary and irrational for two reasons. First, historical divisions

of of the City by the United States Postal Service cannot be an adequate means of determining which businesses remain open and which do not. Indeed, a "hot" block could be miles from another block yet if both are in the same zip code, businesses on both blocks would close, even though business on one block would be far away from the area where there was a data-based concern about Covid-19 spread.

153. Second, due to the interconnected nature of the City, shutting down certain geographic areas of New York City while (thankfully) not restricting any travel between neighborhoods does not prevent the freedom of movement of persons from such areas to other areas of New York City with lower infection rates.

154. As such, Defendants' have arbitrarily restricted the reopening of "hot zones" in New York City without any rational basis.

155. Overall, as recently decided by the Supreme Court, the City and State Orders are "far more severe than what has been shown to be required to prevent the spread of the virus." *R.C. Diocese of Brooklyn*, 2020 WL 6948354 at *2.

### Members of All Classes Continue to be Damaged

156. Restrictions and closings continue through the commencement of this Action, and the easing of restrictions was too late to avoid the deprivation of all economically beneficial use of the properties owned by members of the Classes.

157. The State and City Orders have been widely circulated and are incorporated herein by reference thereto insofar as they are relevant to the facts set forth in this Complaint.

158.    The State and City Orders did not provide for compensation to the affected businesses.

159.    The Class members can demonstrate that Defendants have taken their private property without the payment of just compensation, that their businesses were treated differently compared to similarly situated businesses, and that they were unable to pursue their livelihood and without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, §§ 7 and 11 of the New York State Constitution.

160.    Since the takings at issue here are categorical ones that deprive Plaintiffs and the Class members of all economically beneficial use of their businesses, neither the three-factor test under *Penn Central Transportation Co. v. City of New York*, nor consideration of whether the taking is a proper exercise of police power and not a public use is applicable or relevant here. *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124 (1978).

161.    The businesses of Plaintiffs and the Classes were lawful and not proscribed prior to the State and City Orders.

### Allegations Regarding Lead Plaintiffs

162.    Plaintiff's former business, The Way Station Bar, was a business located within the City of New York from February 23, 2011, to March 17, 2020.

163.    Plaintiff's former business, Italianissimo Ristorante, is a business located within the City of New York since 1996.

164.    Plaintiff's former business, Murdered by the Mob, was a business located within the City of New York from 1992, to March 14, 2020.

165.    The State and City Orders issued by Defendant Governor Cuomo and implemented by Defendant                    Mayor de Blasio, under the color of State law, restricted the Plaintiffs' right to operate their businesses, deprived Plaintiffs of all economically viable use of their properties, and ultimately caused the permanent closure and loss of some Plaintiffs' businesses.

166.    Plaintiffs have standing in this action for at least the following reasons:

(a)    They have actual injury in that they have been deprived of all economically viable use of their commercial real property and thus were deprived of their liberty to pursue a profession and earn a livelihood.

(b)    Their interest is concrete and particularized in that the injury set forth herein is actual and ongoing.

(c)    The State and City Orders, including the guidance relative to the partial easing of at-home restrictions, have directly caused Plaintiffs to suffer the harm complained of herein.

(d)    It is likely that the injuries set out herein will be "redressed by a favorable decision." *N.Y. Coastal P'ship, Inc. v. U.S. DOI*, 341 F.3d 112, 116 (2d Cir. 2003).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of The Takings Clause of the U.S. Constitution
### (Against State Defendants and City Defendants)

167.    Plaintiffs reallege and incorporate into this cause of action the allegations of the paragraphs of the Complaint set forth above.

168.    The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.

169.    "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49.

170.    The Supreme Court "recognized that government regulation of private property may . . . be so onerous that its effect is tantamount to a direct appropriation or ouster . . . and that such 'regulatory takings' may be compensable under the Takings Clause of the Fifth Amendment." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

171.    "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

172.    A regulation that deprives real property of all economically viable use effects a taking of that property. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–16, 1019 (1992); *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 264 (2d Cir. 2014).

173.    Defendants, through the State Orders and the City Defendants enforcement of said orders, as well as through the City Orders, have, without just compensation, permanently deprived Plaintiffs and the State Class and the City Takings Class of all economically viable use of their commercial real property by forcing the closure and restricting the operations of "non-essential" businesses.

174. Defendants therefore worked to deprive Plaintiffs and the State Class and the City Takings Class of their commercial real property interests without compensation.

175. As to Plaintiffs and the State Class and the City Takings Class, Defendants violated the Takings Clause of the Fifth Amendment, made applicable to the State through the Fourteenth Amendment. Plaintiffs and the Classes were damaged as a result of this violation of their constitutional rights.

## SECOND CAUSE OF ACTION
### Violation of the Takings Clause of the New York State Constitution
### (Against City Defendants)[2]

176. Plaintiffs reallege and incorporate into this cause of action the allegations of the paragraphs of the Complaint set forth above.

177. The Takings Clause of Article I, § 7 of the New York State Constitution provides that "[p]rivate property shall not be taken for public use without just compensation." N.Y. Const. art. I § 7.

178. The Takings Clause bars the government from forcing some members of the public to disproportionately bear burdens that should be borne by the public as a whole.

179. The City of New York, through Defendant Mayor de Blasio's enforcement of Defendant Governor Cuomo's State Orders and through the City Orders, has, without just compensation, permanently deprived Plaintiffs and the City Takings Class of all

---

[2] Plaintiffs believe that New York State has violated the Takings Clause of the New York Constitution. However, due to the State's sovereign immunity against State law claims under the Eleventh Amendment, Plaintiffs are not bringing this cause of action against New York State.

economically viable use of their commercial real property by forcing the closure and restricting the operations of "non-essential" businesses.

180.    Defendants therefore worked to deprive Plaintiffs and the City Takings Class of their commercial real property interests without compensation.

181.    Plaintiffs and the City Takings Class were damaged as a result of this violation of their constitutional rights.

## THIRD CAUSE OF ACTION:
### Violation of the Due Process Clause of the U.S. Constitution
### (Against City Defendants)[3]

182.    Plaintiffs reallege and incorporate into this cause of action the allegations of the paragraphs of the Complaint set out above.

183.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State can "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

184.    The substantive component of the Due Process Clause "limits what the government may do in both its legislative. . .and its executive capacities." *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1988). Specifically, substantive due process protection prohibits the government from taking action that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987).

---

[3] Plaintiffs believe that New York State has violated the Due Process Clause of the U.S. Constitution. However, pursuant to 42 U.S.C. § 1983, Plaintiffs are not bringing this cause of action against New York State.

185.    Where the challenged conduct is legislative in nature, Plaintiffs must show both (1) a valid property interest, liberty, or fundamental right and (2) that the defendants infringed that liberty or property interest in an arbitrary or irrational manner. *See Harlen Ass'ns. v. Mineola*, 273 F.3d 494, 503 (2d Cir. 2001).

186.    Liberty "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life." *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972).

187.    As the Second Circuit has stated, "the right to pursue a lawful calling has long been recognized as a fundamental right." *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 95 (2d Cir. 2003); *see Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 339 (E.D.N.Y. 2014) (noting that a person's right to pursue the profession of his choice is recognized as a constitutionally protected liberty interest).

188.    The State and City Orders shock the conscience and interfere with Plaintiffs' and members of the City Equal Protection Class' deeply rooted liberty interests, including the right to work, the right to contract, the right to pursue a lawful calling, and the right to engage in commerce.

189.    Specifically, the State and City Orders have had an adverse effect on the Plaintiffs and the City Equal Protection Class by restricting the operations of "non-essential" businesses, thus depriving the Plaintiffs and the City Equal Protection Class of the ability to pursue their chosen profession.

190.    Plaintiffs and members of the City Equal Protection Class could have and have since proven, with the phased reopening, their ability conduct their businesses in

full compliance with all the rules and safety procedures previously imposed exclusively on "essential businesses," as well as other reasonably equivalent and equally safe measures tailored to the unique nature of in-person operations.

191.    Thus, the State and City Orders were not rationally related to a legitimate government interest.

192.    As to Plaintiffs and the City Equal Protection Class, City Defendants violated the protection of substantive due process as enshrined under the Due Process Clause of the Fourteenth Amendment and Plaintiffs and the Classes were damaged as a result.

## FOURTH CAUSE OF ACTION:
### Violation of the Equal Protection Clause of the U.S. Constitution
### (Against City Defendants)[4]

193.    Plaintiffs reallege and incorporate into this cause of action the allegations of the paragraphs of the Complaint set out above.

194.    The Equal Protection Clause of the Fourteenth Amendment requires that every state and municipal regulation be at a minimum rationally related to a legitimate governmental interest.

195.    The rational basis test is forgiving, but not toothless.  Arbitrary or irrational classifications are not constitutional.  "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

---

[4] Plaintiffs believe New York State has violated the Equal Protection Clause of the U.S. Constitution. However, pursuant to 42 U.S.C. § 1983, Plaintiffs are not bringing this cause of action against New York State.

196.    The restrictions imposed on Plaintiffs and the City Equal Protection Class by the City Defendants were arbitrary and irrational.

197.    These restrictions were based on a purported, pretextual distinction between "essential" and "non-essential" businesses that was not in fact based on whether a business was essential, was not based on risk assessments, was instead based on political considerations, and, in any event, was arbitrary and irrational.

198.    For example, liquor stores were deemed "essential" and exempted from the restrictions imposed on Plaintiffs' and other class members' businesses.  Liquor stores are not, by any rational or non-arbitrary definition, essential to life or the curtailment of the spread of Covid-19.

199.    Moreover, restaurants were recognized as "essential" but then, without explanation, arbitrarily denied the same liberty to conduct their business on-premises granted to other essential businesses.

200.    As stated in greater detail above, the restrictions imposed on Plaintiffs' businesses and the businesses of other City Equal Protection Class members contradicted the known facts about Covid-19 and were not rationally related to the government's legitimate interest in curtailing the spread of the disease.

201.    The Supreme Court has recently highlighted the arbitrariness of New York's classification of "essential" businesses, specifically observing that it includes "acupuncture facilities, campgrounds, garages as well as many whose services are not limited to those that can be regarded as essential, such as all plants manufacturing

chemicals and microelectronics, and all transportation facilities." *R.C. Diocese of Brooklyn*, 2020 WL 6948354, at *1.

202.    The Equal Protection Clause further requires that governmental measures satisfy the much more stringent standard of strict scrutiny when "the challenged action interferes with a fundamental right." *Jesus Christ Is The Answer Ministries v. Baltimore Cnty., Maryland*, 915 F.3d 256, 265 (4th Cir. 2019); *see Zablocki v. Redhail*, 434 U.S. 374, 383 (1978); *Miller v. Cnty. of Nassau*, 467 F. Supp. 2d 308, 319 (E.D.N.Y. 2006) ("If government action interferes with a 'fundamental right . . . it must be reviewed using the strict scrutiny analysis").

203.    The restrictions imposed on Plaintiffs and the City Equal Protection Class by the City Defendants interfered with fundamental rights, including the right to pursue a lawful profession and the right not to be permanently deprived of all economically viable use of real property.

204.    Strict scrutiny requires that a governmental measure be narrowly tailored to further a compelling state interest and the least restrictive means of furthering that interest.

205.    For the reasons stated in greater detail above, the restrictions imposed on Plaintiffs and the City Equal Protection Class by the City Defendants were not narrowly tailored to furthering City Defendants' stated objective and were not the least restrictive means of doing so.

<u>FIFTH CAUSE OF ACTION:</u>
**Violation of the Equal Protection Clause of the New York State Constitution (Against City Defendants)[5]**

206.   Plaintiffs reallege and incorporate into this cause of action the allegations of the paragraphs of the Complaint set out above.

207.   The New York State Constitution's provision on equal protection is as broad in its coverage as that of the Fourteen Amendment. *See Quinn v. Cuomo*, 69 Misc. 3d 171, 176 (Sup. Ct. Queens Cnty. 2020), *aff'd as mod.*, 183 A.D.3d 928 (2d Dep't 2020).

208.   Article I, § 11 of the New York State Constitution provides, in relevant part that "no person shall be denied the equal protection of the laws of this state or any subdivision thereof." N.Y. Const. art. I, § 11.

209.   These restrictions were based on a purported, pretextual distinction between "essential" and "non-essential" businesses that was not in fact based on whether a business was essential, was not based on risk assessments, was instead based on political considerations, and, in any event, was arbitrary and irrational.

210.   As stated in greater detail above, the restrictions imposed on Plaintiffs' businesses and the businesses of other City Equal Protection Class members contradicted the known facts about Covid-19 and were not rationally related to the government's legitimate interest in curtailing the spread of the disease.

---

[5] Plaintiffs believe New York State has violated the Equal Protection Clause of the New York State Constitution. However, due to the State's sovereign immunity against State law claims under the Eleventh Amendment, Plaintiffs are not bringing this cause of action against New York State in this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment as follows:

A.  Certifying the proposed Classes pursuant to Rule 23;

B.  On the First and Second Causes of Action, awarding Plaintiffs and the Classes damages resulting from the deprivation of all beneficial economic use of their commercial real property;

C.  On the Third Cause of Action, awarding Plaintiffs and the City Classes damages from Defendants' violation of their constitutional right to substantive due process;

D.  On the Fourth and Fifth Causes of Action, awarding Plaintiffs and the City Classes damages from Defendants' violation of their constitutional right to equal protection;

E.  Award of costs and expenses, including reasonable attorneys' fees under 42 U.S.C. § 1983; and

F.  Awarding such further relief as the Court finds just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury for all issues so triable in this action.

Dated: New York, New York
        December 10, 2020

By: _____
John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:   (212) 374-5401
Facsimile:    (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs and the Classes*