UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ANDREW HEIDEL, R. ANDREW HEIDEL,
INC. d/b/a THE WAY STATION, FRANKLIN
ORTEGA, PO ITALIANISSIMO INC., JOHN
MEROLLA and NYMS PRODUCTIONS, INC.
d/b/a MURDERED BY THE MOB, individually
and on behalf of classes of all others similarly
situated,

                    Plaintiffs,

                                                    20-cv-10462 (PKC)

          -against-                          OPINION AND ORDER


KATHY HOCHUL, GOVERNOR OF NEW
YORK STATE, IN HER OFFICIAL
CAPACITY, THE STATE OF NEW YORK,
BILL DE BLASIO, MAYOR OF NEW YORK
CITY, IN HIS OFFICIAL CAPACITY, and THE
CITY OF NEW YORK,

                    Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

          Faced with an increasing number of cases of infection from the novel coronavirus

responsible for Covid-19, defendants State of New York (the "State") and the City of New York

(the "City") began to issue and enforce a series of executive orders in March 2020 that were

intended to limit the spread of the virus.  Among other things, the orders had the effect of

prohibiting indoor dining in New York City bars and restaurants.

          Plaintiffs are three New York City small businesses and their owners.  The

Complaint does not expressly allege the type of business each conducts, but they appear to have

operated bars and/or restaurants.  Plaintiffs assert that their businesses were "destroyed or largely

wiped out" as a result of the restrictions put in place by the City and the State.  They seek money

damages but no equitable or injunctive relief.  Plaintiffs also purport to bring claims on behalf of

a putative class that, in addition to bars and restaurants, would include movie theaters, shopping

malls and gyms.

Plaintiffs' claims against the City and Mayor Bill de Blasio are brought pursuant

to section 1983, and assert that the restrictions effected a categorical regulatory taking of

plaintiffs' property without just compensation, in violation of the Fifth Amendment to the U.S.

Constitution and the New York Constitution, violated the substantive due process guaranteed by

the Fourteenth Amendment and subjected plaintiffs to arbitrary and irrational classifications in

violation of the Equal Protection guaranteed by the Fourteenth Amendment and the New York

Constitution.  42 U.S.C. § 1983.  As to the State of New York and Governor Kathy Hochul,[1] the

Complaint asserts only a Takings claim under the Fifth Amendment.  Plaintiffs do not bring this

claim under section 1983 and urge that they need not do so because the Fifth Amendment's

Takings clause is "self-executing."

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6), Fed. R.

Civ. P.  As will be discussed, the Complaint fails in several respects to allege a plausible claim

for relief.  The Eleventh Amendment, as construed, shields the State and Hochul from the

Takings claim.  As to the claims against the City and de Blasio, the Complaint does not allege

facts that describe a violation of any plaintiff's constitutional rights.  The injury allegations

consist of broad generalities that do not describe how any plaintiff's revenues or operations were

---

[1] The Complaint originally asserted this claim against then-Governor Andrew Cuomo in his official capacity.  The Court takes judicial notice that Cuomo has since resigned his position and that Hochul was sworn in as governor on August 24, 2021.  Upon the resignation of a public officer sued in an official capacity, "[t]he officer's successor is automatically substituted as a party."  Rule 25(d), Fed. R. Civ. P.  Hochul is therefore substituted for Cuomo and the caption is so amended.

affected by defendants' allegedly unlawful executive orders.  Similarly, because plaintiffs were permitted to continue in business by serving customers through takeout, delivery and outdoor dining, the Complaint does not describe a deprivation that violated a constitutional right.  As to the Equal Protection claim, it is premised on a purportedly arbitrary distinction between essential and non-essential businesses, but plaintiffs' businesses were classified as "essential retail," which calls into question whether their Equal Protection claim is justiciable.  Even if it is, the Complaint does not plausibly allege an injury under the Equal Protection clause.

Defendants' motions to dismiss will therefore be granted.  The Complaint will be dismissed in its entirety and judgment will be entered for defendants.

BACKGROUND

A. <u>Overview of the Plaintiffs.</u>

As noted, plaintiffs are three businesses and their owners.  Plaintiff R. Andrew Heidel Inc., doing business as The Way Station ("The Way Station") alleges that it was in business in Brooklyn from February 23, 2011 until its closing on March 17, 2020.  (Compl't ¶ 48.)  It was owned by plaintiff Andrew Heidel.  (Compl't ¶ 48.)  Plaintiff PO Italianissimo Inc. ("Italianissimo Ristorante") has been in business in Staten Island since 1996.  (Compl't ¶ 49.)  It is owned by plaintiff Franklin Ortega.  (Compl't ¶ 49.)  Plaintiff NYMS Productions, Inc., doing business as Murdered by the Mob ("Murdered by the Mob") was continuously in business in Manhattan from its 1992 opening until its closing on March 14, 2020.  (Compl't ¶ 50.)  It was co-owned by plaintiff John Merolla.  (Compl't ¶ 50.)

The Complaint makes few other allegations about plaintiffs, their businesses and the injuries they claim to have suffered as a result of the governmental restrictions.  Plaintiffs do not expressly identify their business as a bar, a restaurant, or the like.  Each is described only as

"a business."  (Compl't ¶¶ 48-50, 162-64.)  The City's memorandum on the motion to dismiss describes Murdered by the Mob as a dinner theater and indicates that The Way Station and Italianissimo Ristorante were bars and/or restaurants.  (City Mem. at 11, 15 n.22.)  Plaintiffs have not disputed these characterizations.

While the Complaint makes detailed allegations about public health orders issued by the State and the City, it includes no factual allegations about how those orders affected plaintiffs individually, including any effect on revenue or business operations, or any attempt to stay in business under modified pandemic conditions.  The Complaint also alleges that The Way Station closed on March 17, 2020 and Murdered by the Mob closed on March 14, 2020, before many of the disputed orders became effective.

The Complaint does not specify if the closures were permanent or temporary. The Complaint alleges that plaintiffs' businesses were "destroyed or largely wiped out by the global burden that has been unfairly placed disproportionately on them."  (Compl't ¶ 23.)  It also alleges that governmental restrictions "deprived Plaintiffs of all economically viable use of their properties, and ultimately caused the permanent closure and loss of some Plaintiffs' businesses." (Compl't ¶ 165; see also Compl't ¶¶ 166, 173.)

B.  The Public Health Orders Issued by the State and the City.

In March 2020, as the novel coronavirus was found to have a widespread presence in New York City and elsewhere, the State and City began to issue orders "which had, especially at first, the laudable goal of protecting the public good and promoting public health."  (Compl't ¶ 21.)

On March 7, 2020, then-Governor Cuomo issued State Order 202, which declared a State Disaster Emergency caused by Covid-19 transmissions.  (Compl't ¶ 69.)  On March 12,

2020, State Order 202.1 canceled or postponed gatherings of more than 500 persons, which led to the closure of theaters seating 500 or more attendees.  (Compl't ¶ 70.)  From March 7, 2020 through April 7, 2020, Cuomo issued State Orders 202.1 through 202.14, which closed or restricted certain businesses.  (Compl't ¶ 71.)  This included State Order 202.3, which was issued on March 16, 2020 and required businesses serving food and drink on premises to close at 8 p.m. (Compl't ¶ 75.)

State Order 202.6, which was entered on March 18, 2020, established categories of businesses deemed "essential" and "non-essential."  (Compl't ¶ 78.)  Under the heading of "Essential retail," the order listed "restaurants/bars (but only for take-out/delivery)".[2]  A sequence of state orders issued between March 20 and March 25, 2020 required businesses deemed "non-essential" to reduce their in-person workforces by 50 percent, 75 percent and 100 percent, respectively.  (Compl't ¶¶ 82-83.)

The City issued a series of separate but similar orders.  On March 12, 2020, de Blasio declared a local state of emergency in the City.  (Compl't ¶ 72.)  On March 15, 2020, de Blasio issued City Order 99, which canceled gatherings of more than 100 people, and capped capacity of food-and-drink venues to 50 percent.  (Compl't ¶ 73.)  The next day, on March 16, 2020, de Blasio signed City Order 100, which immediately limited food-and-drink establishments to takeout and delivery services only; this order was renewed and extended every five days until it was ultimately modified by City Order 127.  (Compl't ¶ 74.)  On March 20, 2020, de Blasio signed City Order 102, which ordered "non-essential" businesses to reduce in-person workforces by 50 percent on March 20, and by 75 percent on March 21.  (Compl't ¶ 90.)

---

[2] See https://esd.ny.gov/guidance-executive-order-2026

Order 102 also incorporated by reference the restrictions put in place by the State's orders. (Compl't ¶¶ 91-92.)

The Complaint alleges that in New York City, orders issued by the State were enforced by City employees, including members of the New York City Police Department. (Compl't ¶¶ 87, 89.)  Because of this enforcement role, plaintiffs assert that the City and de Blasio are liable for restrictions put in place by the State.  (Compl't ¶¶ 173, 179.)

Plaintiffs asserts that the various orders issued by the City and the State failed to address "the inherent financial burden" placed on businesses and individuals and failed to establish a procedure where affected parties could seek relief.  (Compl't ¶¶ 93-94.)  They assert a significant disparity between the burdens placed on "essential" and "non-essential" businesses and assert that these distinctions lacked a basis in public-health concerns.  (Compl't ¶¶ 95-101.)

C.  <u>The Complaint's Additional Allegations.</u>

On May 11, 2020, Cuomo announced a plan to "reopen[ ] our economy" in phases, based on region-specific metrics.  (Compl't ¶¶ 102-03.)  Plaintiffs assert that the State's reopening plans had a discriminatory effect on persons and businesses in New York City. (Compl't ¶¶ 102-23.)  They assert that after issuing objective criteria for phased, regional-based reopening, defendants continued to impose lockdown measures in the City even after the stated safety benchmarks were met.  (Compl't ¶¶ 103-07.)  Plaintiffs assert that the there was no data-supported, rational basis for prolonging restrictions in the City and note that they had been lifted in other regions of New York State that were showing more dire Covid-19 metrics.  (Compl't ¶¶ 108-23.)

The Complaint points to press coverage of a purported political rivalry between Cuomo and de Blasio, and notes that if such "speculation is accurate," their political feud would

not justify disparate treatment of the City's businesses.  (Compl't ¶¶ 124-26.)  Plaintiffs'
opposition memo annexes a blog post, press releases and media coverage relating to
controversies involving Cuomo and de Blasio, including allegations of sexual harassment made
against the then-governor.  (Schmidt Dec. Exs. C, D, G-N.)  The Complaint also quotes a remark
from Cuomo that described the City as "different demographically" from the rest of the state,
which plaintiffs dispute by noting that "eastern Queens largely resembles Nassau County," "[t]he
Northern Bronx largely resembles Westchester," and that cities such as Yonkers, New Rochelle
and White Plains have higher population density than Staten Island and portions of Brooklyn.
(Compl't ¶ 130.)  Plaintiffs urge that there was no sound scientific reason to regulate the City
more stringently than other regions of New York state.  (Compl't ¶¶ 134-47.)

        The Complaint also describes circumstances that it characterizes as the "Hot Zone
in Autumn."  (Compl't ¶¶ 148-55.)  As described in the Complaint, in October 2020, de Blasio
announced a plan to target business and school closures to certain zip codes based on clusters of
confirmed positive cases of Covid-19.  (Compl't ¶¶ 149-50.)  Cuomo then issued an October 6,
2020 order that established color-coded zones with enhanced restrictions targeted to case
clusters.  (Compl't ¶ 150.)  According to plaintiffs, these classifications were arbitrary and
capricious because the virus does not observe geographical boundaries, and likely resulted in
over-inclusive geographical restrictions.  (Compl't ¶¶ 152-53.)

        The Complaint also summarizes orders with no apparent connection to the
plaintiffs and their claims, including a ban on the non-essential business travel of City
employees, a ban on ride sharing and the closure of shopping malls and movie theaters.
(Compl't ¶¶ 72, 76, 90, 119-23.)

No plaintiff alleges that it fell within a restricted zone or explains what effect, if any, the zone-based restrictions had on its business.  Similarly, while the Complaint describes in detail the State's region-oriented reopening policies, no cause of action asserts a constitutional injury based on these differences in treatment.  Indeed, the Complaint expressly acknowledges that those issues are "beyond the scope of this action . . . ."  (Compl't ¶ 13.)

RULE 12(b)(6) STANDARD.

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth.  Id.; see also Smith v. Loc. 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) ("[L]egal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.") (quotation marks omitted).  Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief."  Iqbal, 556 U.S. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

"Under Iqbal, factual allegations must be sufficient to support necessary legal conclusions."  Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).  For instance, a plaintiff asserting the denial of Equal Protection may not rely on "general allegations," and must set forth specific examples of how the plaintiff was treated unfavorably

compared to others similarly situated.  Id.  The claim of a categorical regulatory taking also must be supported by facts that describe a connection between a public health order and the property deprivation that a plaintiff claims to have suffered.  See, e.g., Nowlin v. Pritzker,  2021 WL 669333, at *7 (C.D. Ill. Feb. 17, 2021) (complaint did not allege a categorical regulatory taking where "[p]laintiffs failed to plead basic facts about their business, including what types of services they offer or how they were impacted by the Governor's orders.  They provide the name of the businesses and assert they lost income without additional details.").

DISCUSSION.

I.      Plaintiffs' Claim against Hochul and the State of New York Will Be
        Dismissed on Grounds of Sovereign Immunity.

        A.  The Eleventh Amendment Bars Plaintiffs' Claim
            against the State of New York.

The Fifth Amendment states in part that private property may not "be taken for public use, without just compensation."  "A regulatory taking . . . occurs where even absent a direct physical appropriation, governmental regulation of private property goes too far and is tantamount to a direct appropriation or ouster."  1256 Hertel Ave. Assocs., LLC v. Calloway, 761 F.3d 252, 263 (2d Cir. 2014) (quotation marks omitted).

Count One asserts that Hochul and the State violated the Fifth Amendment's Takings clause by promulgating regulations that deprived plaintiffs of all economically viable use of their real property without just compensation.  (Compl't ¶¶ 167-75.)  The claim against Hochul and the State is not brought under section 1983, and the Complaint asserts that the Fifth Amendment's Takings clause is "self-executing."[3]  (Compl't ¶ 41.)  The authority for bringing a

---

[3]  The Supreme Court and the Second Circuit have repeatedly observed that section 1983 does not allow for a money-damages claim against sovereign states or state officials who are sued in an official capacity.  See, e.g., Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989) ("Section 1983 provides a federal forum to remedy many

Takings claim on the face of the Fifth Amendment – without reliance on section 1983 or a similar remedial statute – is unsettled.  See Community Housing Improvement Program v. City of New York, 492 F. Supp. 3d 33, 40-41 (E.D.N.Y. 2020) (summarizing recent authority on the "self-executing" character of the Takings clause).  However, for the limited purposes of this Opinion and Order, the Court assumes without deciding that the "self-executing" nature of the Takings clause could permit a plaintiff to bring a claim without relying on section 1983.

For the reasons that will be explained, the Court concludes that the Eleventh Amendment bars plaintiffs' claim against the State of New York.  Its motion to dismiss will therefore be granted.

"The Eleventh Amendment provides: 'The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'  Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States.  The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."  Bd. of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 363 (2001) (citations omitted).  "[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III . . . ."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98-99 (1984) (citing Ex parte State of

---

deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."); Id. at 71 ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself.") (quotation marks omitted); Restivo v. Hessemann, 846 F.3d 547, 583 (2d Cir. 2017) ("[I]t is axiomatic that a state is not a proper defendant in an. action brought pursuant to Section 1983."). Consistent with Ex Parte Young, 209 U.S. 123 (1908), a plaintiff may seek prospective injunctive relief under section 1983 against a state officer sued in his or her official capacity, but no injunctive relief is sought here.  See, e.g., Will, 491 U.S. at 71 n.10.

New York No. 1, 256 U.S. 490, 497 (1921)).  A state may waive its immunity against suit, but the waiver must be "unequivocally expressed."  Id. at 99.  "Similarly, although Congress has power with respect to the rights protected by the Fourteenth Amendment to abrogate the Eleventh Amendment immunity, [the Supreme Court has] required an unequivocal expression of congressional intent to overturn the constitutionally guaranteed immunity of the several States."  Id. (citations and quotation marks omitted).

Plaintiffs urge that Eleventh Amendment immunity does not apply to their Takings claim against the State and Hochul.  They point to language in Knick v. Twp. of Scott, Pennsylvania, 139 S. Ct. 2162, 2170 (2019), which held that there is no exhaustion requirement for a plaintiff who seeks to bring a Takings claim against a municipality pursuant section 1983.  Knick stated in part that "no matter what sort of procedures the government puts in place to remedy a taking, a property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it."  Id.  Plaintiffs argue that this language should be applied broadly, and that it allows for a Takings claim against a sovereign state regardless of Eleventh Amendment immunity.

But Knick addressed a different issue – whether a section 1983 claim against a municipality could be brought in federal court without first exhausting state remedies – and did not involve the immunity afforded to sovereign states by the Eleventh Amendment.  Several Courts of Appeals have since concluded that Knick does not alter the Eleventh Amendment analysis when a Takings claim is brought against a state.  See Zito v. N. Carolina Coastal Res. Comm'n, 8 F.4th 281, 286 (4th Cir. 2021) ("Knick did not address sovereign immunity, as it involved a suit against a town."); Ladd v. Marchbanks, 971 F.3d 574, 579 (6th Cir. 2020) ("[T]he Court's opinion in Knick says nothing about sovereign immunity."); Williams v. Utah Dep't of

Corr., 928 F.3d 1209, 1214 (10th Cir. 2019) ("But Knick did not involve Eleventh Amendment immunity, which is the basis of our holding in this case."); Bay Point Props., Inc. v. Miss. Transp. Comm'n, 937 F.3d 454, 456-57 (5th Cir. 2019) ("Nor does anything in Knick even suggest, let alone require, reconsideration of longstanding sovereign immunity principles protecting states from suit in federal court.").

   The Second Circuit has not addressed Knick's effect on the sovereign immunity issue, if any, but in a non-precedential Summary Order, it recently affirmed the dismissal of Takings claims brought against state agencies and individual state defendants on Eleventh Amendment grounds.  Morabito v. New York, 803 Fed. App'x 463, 465 & n.2 (2d Cir. 2020). District courts in this Circuit have concluded that the Eleventh Amendment continues to operate as a bar to Takings claims against a sovereign state.  See Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York, 2021 WL 4198332, at *9 (S.D.N.Y. Sept. 14, 2021) (Karas, J.); Community Housing, 492 F. Supp. 3d at 39-43; Aldridge v. Lamont, 2020 WL 7773415, at *3 (D. Conn. Dec. 30, 2020).

   The Court is unaware of any authority that has interpreted Knick to modify the Eleventh Amendment's role in a Takings claim, and plaintiffs have pointed to none.  As noted, the critical issue in Knick related to a section 1983 claim brought against a municipality, and neither its holding nor analysis speaks to the immunity afforded by the Eleventh Amendment. The Court therefore concludes that the Eleventh Amendment continues to provide immunity to a sovereign state that is sued for money damages under the Takings clause.

   The Complaint will therefore be dismissed as to the State of New York.

B.  The Eleventh Amendment Also Bars Plaintiffs' Claim against Hochul.

Plaintiffs' claim against Hochul also will be dismissed.  The Complaint brings a claim for money damages against Hochul in her official capacity, not her personal or individual capacity.  (Compl't at 2.)  "To the extent that a state official is sued for damages in [her] official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."  Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993); see also Will, 491 U.S. at 71 ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself.") (citation omitted).

The Complaint will therefore be dismissed as to Hochul.

C.  State Tribunals Provide an Effective Remedy for Plaintiffs' Takings Claim.

Lastly, plaintiffs urge that Count One ought not be dismissed as to the State and Hochul because New York's courts do not provide a mechanism for class-wide relief for a Takings claim.  Some courts have suggested, but not expressly held, that a plaintiff may pursue a Takings claim against a sovereign state in federal court if the state courts do not provide an avenue for judicial relief.  See, e.g., Community Housing, 492 F. Supp. 3d at 40 n.5 ("No court has reached the ultimate question of whether the Takings Clause usurps the Eleventh Amendment when no remedy is available in the state courts.  Given New York's express remedy, this Court need not reach that issue.").

The New York Court of Claims has jurisdiction over actions brought against the state "for the appropriation of real or personal property or any interest therein."  Court of Claims Act § 9(2).  Plaintiffs urge that the Court of Claims does not permit actions brought on behalf of a class, and that the federal courts offer plaintiffs their only avenue for relief.  The Second

- 13 -

Department has concluded that for a proceeding styled as a class action, the Court of Claims Act requires that each claimant be identified by name, with additional detail about the nature of the injury and damages sought.  Weaver v. State, 82 A.D.3d 878, 879 (2d Dep't 2011); see also Arroyo v. State, 12 Misc. 3d 1197(A) (N.Y. Ct. Cl. 2006) (a class action pursued in the Court of Claims must identify each plaintiff).  Weaver explained that the Court of Claims Act embodies the state's express waiver of sovereign immunity, and that in order for a claim to proceed, all statutory requirements about the identity of plaintiffs and their injuries must be strictly applied. 82 AD.3d at 879.

Accepting that the Court of Claims does not allow for a class action mechanism comparable to the one provided by Rule 23, Fed. R. Civ. P., plaintiffs' argument for abrogating the Eleventh Amendment's protections is still meritless.  First, plaintiffs do not claim that they themselves are foreclosed from seeking relief in the Court of Claims.  Their ability to obtain redress through the Court of Claims is sufficient to end the inquiry.  The Court further notes, however, the axiomatic principle that "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 613 (1997) (quoting 28 U.S.C. § 2072(b)).  Plaintiffs' argument about the availability, or lack thereof, of class-wide relief in a state proceeding would give Rule 23 priority over the Eleventh Amendment.  Under plaintiffs' approach, if a sovereign state does not offer a mechanism akin to a Rule 23 class, the federal courts could hear claims for money damages against a state provided that the claims are purported to be brought on behalf of a class. This encroachment on sovereign immunity lacks support in the Eleventh Amendment, the Rules Enabling Act, or any other authority known to the Court.

Plaintiffs' argument about the lack of availability of class-wide relief in the Court of Claims does not salvage their claim against the State and Hochul.

II.   The Complaint Does Not Plausibly State a Claim for Relief against the <u>City or de Blasio.</u>

A.   <u>The Complaint Does Not Plausibly Allege a Regulatory Taking.</u>

Count One of the Complaint asserts that the City and de Blasio violated the Fifth Amendment's Takings clause, and Count Two asserts that they violated the Takings clause contained in Article I, section 7 of the New York State Constitution.  (Compl't ¶¶ 167-81.) Plaintiffs assert that the City Defendants effected a categorical regulatory taking of their commercial real property both by enforcing the orders issued by New York State and by promulgating and enforcing the City's own orders.  (Compl't ¶¶ 64, 160, 173, 179.)

Because the Complaint does not plausibly allege that the City Defendants deprived plaintiffs of all economically viable, beneficial or productive use of their real property, the motion to dismiss Counts One and Two will be granted.

"The Takings Clause is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" <u>Arkansas Game & Fish Comm'n v. United States</u>, 568 U.S. 23, 31 (2012) (quoting <u>Armstrong v. United States</u>, 364 U.S. 40, 49 (1960)).  "The Supreme Court has 'generally eschewed any set formula' for identifying regulatory takings, instead 'preferring to engage in essentially ad hoc, factual inquiries' to determine in each case whether the challenged property restriction rises to the level of a taking." <u>1256 Hertel Ave.</u>, 761 F.3d at 264 (quoting <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1015 (1992)).

Judge Cote thoroughly summarized the current state of the law on regulatory

Takings in Our Wicked Lady LLC v. Cuomo, 2021 WL 915033, at *6 (S.D.N.Y. Mar. 9, 2021),

which the Court quotes in full:

> "The law recognizes two species of Takings: physical Takings and
> regulatory Takings." Buffalo Teachers Fed'n v. Tobe, 464 F.3d
> 362, 374 (2d Cir. 2006). "Physical Takings . . . occur when the
> government physically takes possession of an interest in property
> for some public purpose." Id.
>
> "A regulatory taking . . . occurs where even absent a direct physical
> appropriation, governmental regulation of private property goes too
> far and is tantamount to a direct appropriation or ouster." 1256
> Hertel Ave. Assocs., LLC v. Calloway, 761 F.3d 252, 263 (2d Cir.
> 2014) (citation omitted). There are also two types of regulatory
> Takings: categorical and non-categorical. Sherman v. Town of
> Chester, 752 F.3d 554, 564 (2d Cir. 2014). A categorical taking
> occurs when "a regulation . . . denies all economically beneficial or
> productive use of land." Murr v. Wisconsin, 137 S. Ct. 1933, 1937,
> (2017) (citation omitted). A non-categorical taking may result from
> "[a]nything less than a complete elimination of value, or a total
> loss." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan.
> Agency, 535 U.S. 302, 330 (2002). In that case, "a taking may be
> found based on a complex of factors, including (1) the economic
> impact of the regulation on the claimant; (2) the extent to which the
> regulation has interfered with distinct investment-backed
> expectations; and (3) the character of the governmental action."
> Murr, 137 S. Ct. at 1937 (citation omitted). Plaintiffs attempting to
> establish a regulatory taking bear a "heavy burden." Buffalo Tchrs.
> Fed'n, 464 F.3d at 375.

A categorical regulatory taking occurs in "the extraordinary circumstance when no productive or

economically beneficial use of land is permitted." Tahoe-Sierra, 535 U.S. at 330 (emphasis in

original) (quotation marks omitted); accord Lucas, 505 U.S. at 1019 (a regulatory taking takes

place "when the owner of real property has been called upon to sacrifice all economically

beneficial uses in the name of the common good, that is, to leave his property economically idle,

he has suffered a taking.") (emphasis in original).   The regulation must cause "a permanent

obliteration of the value," "a 'complete elimination of value,' or a 'total loss' . . . ." Tahoe-

Sierra, 535 U.S. at 330 (quoting Lucas, 505 U.S. at 1019-20, n.8).  "[T]he categorical rule would not apply if the diminution in value were 95% instead of 100%."  Id. (citing Lucas, 505 U.S. at 1019 n.8).  The guarantee against Takings provided by the New York Constitution is generally treated as coextensive to that of the U.S. Constitution.  See, e.g., Am. Econ. Ins. Co. v. State, 30 N.Y.3d 136, 155 (2017).

       The Complaint's allegations as to the complete loss of economic use of real property are conclusory and unsupported by factual allegations as to any plaintiff.  Plaintiffs broadly asserts that they "have actual injury in that they have been deprived of all economically viable use of their commercial real property and thus were deprived of their liberty to pursue a profession and earn a livelihood."  (Compl't ¶ 166(a).)  But the Complaint describes only restrictions on their ability to provide indoor service to customers.  The allegation that a plaintiff has been deprived of an economically viable, beneficial or productive use of real property is a legal conclusion that must be supported by allegations of fact.[4]  See Nowlin, 2021 WL 669333, at *7 (complaint did not allege a categorical regulatory taking where "[p]laintiffs failed to plead basic facts about their business, including what types of services they offer or how they were impacted by the Governor's orders.  They provide the name of the businesses and assert they lost income without additional details."); see also Monroe Equities LLC v. Vill. of Monroe, 2010 WL 11526768, at *3 n.2 (S.D.N.Y. June 17, 2010) (Seibel, J.) (dismissing Takings claim where plaintiff failed to allege underlying facts about economically viable uses of its property); Palermo v. Town of N. Reading, 370 Fed. App'x 128, 131 n.4 (1st Cir. 2010) (unsupported

---

[4] The Supreme Court has stated that a categorical regulatory taking occurs "in the 'extraordinary case' in which a regulation permanently deprives property of all value . . . ."  Tahoe-Sierra, 535 U.S. at 333.  While an economically "viable," "beneficial" or "productive" use might be understood to have different meanings and look to different considerations, courts have not drawn a distinction between the terms.  Under any definition, the Complaint does not allege facts that plausibly allege a categorical regulatory taking.

allegation that plaintiffs were deprived "of all economically beneficial use" of property failed to state a claim for relief) (summary order).[5]

Plaintiffs do not describe how their own businesses were affected by the executive orders or allege facts that would tend to show that the orders deprived them of all economically viable, beneficial or productive use of their real property.  The Complaint alleges that plaintiff The Way Station Bar "was a business located within the City of New York from February 23, 2011, to March 17, 2020" and that plaintiff Italianissimo Ristorante "is a business located within the City of New York since 1996."  (Compl't ¶¶ 48-49, 162-63.)  The Complaint does not describe how the challenged orders affected either business or deprived them of the economically beneficial use of their property.  As the Complaint recognizes, City Order 100 and State Order 202.6 expressly permitted food-and-drink establishments to conduct business through takeout and delivery orders.  (Compl't ¶ 74.)  The Complaint also notes that defendants "permitted and encouraged" outdoor dining.  (Compl't ¶ 135.)  Takeout, delivery and outdoor dining, alone or in combination, were likely less profitable than indoor dining, but they certainly allowed for productive and economically beneficial use of plaintiffs' interest in their businesses. See, e.g., Tahoe-Sierra, 535 U.S. at 331, 332 (a categorical regulatory taking occurs only if there is "a total taking of the entire parcel" but "a temporary restriction that merely causes a diminution in value is not."); see also McCarthy v. Cuomo, 2020 WL 3286530, at *5 (E.D.N.Y.

---

[5] While the Court need not reach the issue, the Second Circuit has observed in dictum that the Supreme Court's precedent on categorical regulatory takings has solely addressed restrictions on the use of land and not other categories of property.  1256 Hertel Ave., 761 F.3d at 264 & n.8 ("The Lucas Court repeatedly referred to regulation that deprives 'land' (not 'property') of all economically beneficial use, and subsequent decisions of the circuit courts have not reached a clear consensus on how broadly to apply Lucas's per se rule  The Lucas Court also specifically distinguished regulation of land from regulation of personal property, which, it explained, might even face regulation that would render it economically worthless 'by reason of the State's traditionally high degree of control over commercial dealings.'") (quoting Lucas, 505 U.S. at 1027-28).  Plaintiffs have made no allegations about regulatory restrictions specific to the use of land.

June 18, 2020) ("If [plaintiff] has lost all income from his club, that is a result of a voluntary choice not to pursue alternative business models that would allow the business to remain open while complying with the regulation.") (Ross, J.).

The Complaint's allegations are also vague as to plaintiff Murdered by the Mob, and do not describe any deprivation that it claims to have suffered.  It is described as "a business located within the City of New York from 1992, to March 14, 2020."  (Compl't ¶ 164.)  The Complaint does not identify the type of business conducted by Murdered by the Mob or how it was affected by the governmental orders described in the Complaint.  A footnote in the City Defendants' memorandum describes Murdered by the Mob as a dinner theater, and notes that it could have made economically beneficial use of its business by offering takeout meals and broadcasting performances virtually.  (Def. Mem. at 15 n.22.)  The claims of Murdered by the Mob are dismissed based on its failure to identify its business and or to allege how that business was affected by the orders described in the Complaint.  Assuming that it operated as a dinner theater, the Complaint also does not describe how the disputed governmental orders deprived it of an economically beneficial use of its real property when the premises could have been used for takeout business or streaming performances.

The Complaint also is bereft of factual allegations as to individual plaintiffs Andrew Heidel, Franklin Ortega and John Merolla.  They are identified only as the respective owners of the plaintiff businesses, with no allegations as to the economic deprivation suffered by each of them.

Lastly, plaintiffs have attempted to salvage their Takings claims in their opposition memorandum by recasting Counts One and Two as asserting that defendants' orders effected a temporary taking of their real property.  But the Complaint expressly alleges that "the

Takings at issue here are categorical ones . . . ."  (Compl't ¶ 160; see also Compl't ¶ 64(b)(iv).)

It also alleges that plaintiffs "did not merely suffer temporary restrictions" on their businesses.

(Compl't ¶ 3.)  The Complaint does not provide defendants with notice that plaintiffs have

brought claims for relief based on temporary Takings.  But even if it had asserted a temporary

taking, the Complaint make no allegation as to the nature and extent of the purported interference

with any plaintiff's property.  See, e.g., Tahoe-Sierra, 535 U.S. at 335 (a claimed temporary

taking "requires careful examination and weighing of all the relevant circumstances"); Penn

Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124-28 (1978) (relevant factors to identify

a non-categorical taking include the extent government action interferes with plaintiff's

investment-backed expectations, the character of the governmental action (including whether the

action promoted "the health, safety, morals, or general welfare" of the public) and whether

government conduct amounted to a "physical invasion" of property, among others).  The

Complaint goes so far as to state that because plaintiffs assert a categorical taking, "neither the

three-factor test under [Penn Central] nor consideration of whether the taking is a proper exercise

of police power and not a public use is applicable or relevant here."  (Compl't ¶ 160.)  The

Complaint therefore does not include facts that plausibly allege a non-categorical, temporary

taking.

Because the Complaint does not plausibly allege that any plaintiff was deprived of

a productive or economically beneficial use of its real property, Counts One and Two will be

dismissed against the City and de Blasio.

B.   The Complaint Does Not Plausibly Allege a Substantive Due Process Claim.

Count Three asserts that restrictions placed on plaintiffs' businesses violated the

substantive due process guaranteed to them by the Fourteenth Amendment.  (Compl't ¶¶ 182-

92.)  Plaintiffs assert that the orders issued and enforced by the City and de Blasio shock the

conscience, and that they interfered with plaintiffs' fundamental right to work, contract, pursue a

lawful calling and engage in commerce.  (Compl't ¶ 188.)

      "[T]he Due Process Clause of the Fourteenth Amendment embodies a substantive

component that protects against 'certain government actions regardless of the fairness of the

procedures used to implement them.'"  Bryant v. New York State Educ. Dep't, 692 F.3d 202,

217 (2d Cir. 2012) (quoting Immediato v. Rye Neck Sch. Dist., 73 F.3d 454, 460 (2d Cir. 1996)).

"In examining whether a government rule or regulation infringes a substantive due process right,

the first step is to determine whether the asserted right is fundamental – i.e., implicit in the

concept of ordered liberty, or deeply rooted in this Nation's history and tradition."  Id. (quotation

marks omitted).  If the infringed right is fundamental, the regulation is subject to strict scrutiny,

and "must be narrowly tailored to serve a compelling government interest."  Id.  If the regulation

does not infringe a fundamental right, the government action "need only be reasonably related to

a legitimate state objective."  Id. (quotation marks omitted); see also Grand River Enterprises Six

Nations, Ltd. v. Boughton, 988 F.3d 114, 121 (2d Cir. 2021) (substantive due process is not

offended when government action is "rationally related to a legitimate state interest.").

      Plaintiffs do not plausibly allege the infringement of a fundamental right.  The

due process clause "includes some generalized due process right to choose one's field of private

employment," but that right "is nevertheless subject to reasonable government regulation."  Conn

v. Gabbert, 526 U.S. 286, 291-92 (1999); see also New Motor Vehicle Bd. of California v. Orrin

W. Fox Co., 439 U.S. 96, 107 (1978) ("'[c]ertain kinds of business may be prohibited; and the

right to conduct a business, or to pursue a calling, may be conditioned . . . .'") (quoting Nebbia v.

New York, 291 U.S. 502, 528 (1934)).  A plaintiff may suffer a constitutional injury if a

government body enacts "a complete prohibition of the right to engage in a calling . . . ."  Conn, 526 U.S. at 292; see also Schultz v. Incorporated Village of Bellport, 479 Fed. App'x 358, 360 (2d Cir. 2012) ("[T]his type of due process claim requires a showing that the plaintiff has been prevented from exercising his right to choose his own employment.") (summary order). "[B]usiness losses alone do not implicate the Due Process right of occupational choice."  Hu v. City of New York, 927 F.3d 81, 102 (2d Cir. 2019); accord JWJ Indus., Inc. v. Oswego Cty., 538 Fed. App'x 11, 14 (2d Cir. 2013) ("Due process has not been construed to preclude government actions that adversely affect a business's profitability.") (summary order).

As discussed in connection with the Takings claim, the Complaint does not allege facts demonstrating that plaintiffs were prohibited from pursuing a lawful calling, engaging in commerce, making contracts or obtaining employment.  The Complaint acknowledges that defendants' orders continued to allow for takeout and delivery service and that defendants encouraged businesses to provide outdoor dining.  Courts have consistently held that these and similar restrictions do not infringe a fundamental right.  See, e.g., Our Wicked Lady, 2021 WL 915033, at *4 ("Under the State and City orders, the plaintiffs may continue to operate their businesses through in-person dining with certain capacity limits and may conduct other aspects of their business, including take-out and delivery services."); Columbus Ale House, Inc. v. Cuomo, 495 F. Supp. 3d 88, 94 (E.D.N.Y. 2020) ("plaintiff cannot show that it has been prevented from operating its business completely because the midnight close rule does not prohibit plaintiff's operations, it just restricts them.") (Cogan, J.).  And, again, the Complaint does not even include factual allegations as to how the defendants' orders affected the operations of any individual plaintiff.  Plaintiffs therefore have not plausibly alleged the infringement of a fundamental right.

Because plaintiffs have not identified the infringement of a fundamental right, the restrictions placed on their businesses "need only be reasonably related to a legitimate state objective." Bryant, 692 F.3d at 217.  As several courts deciding similar due process claims have explained, Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11 (1905), remains the leading authority on reviewing the reasonableness of a governmental order directed to a public-health emergency.[6] Jacobson counsels broad, but not unlimited, deference for public health measures adopted by elected officials "to be enforced by reasonable regulations, as the safety of the general public may demand." Id. at 29.  Courts should refrain from interfering with the judgments of elected authorities unless measures are adopted in "an arbitrary, unreasonable manner," "go so far beyond what was reasonably required for the safety of the public," "invade[] the domain of Federal authority" or "violat[e] rights secured by the Constitution . . . ." Id. at 28. Courts should intervene where a government action "has no real or substantial relation" to public health or causes "a plain, palpable invasion of rights secured by fundamental law . . . ." Id. at 31.

As other courts have concluded, the restrictions on plaintiffs' businesses are reasonably related to the governmental interest in containing the spread of the novel coronavirus. Columbus Ale House, 495 F. Supp. 3d at 93 (governmental restrictions on indoor dining has a real and substantial relation to the public-health goal of containing the novel coronavirus); Our Wicked Lady, 2021 WL 915033, at *4 ("It is rational for the government to limit the number of

---

[6] Because "Jacobson predated the modern constitutional jurisprudence of tiers of scrutiny," it does not use the language of rational basis review.  Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 635 (2d Cir. 2020).  Still, it has been observed that Jacobson "essentially applied rational basis review . . . ."  Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring).  Agudath concluded that Jacobson's deferential standard does not apply where a public-health measure restricts a fundamental right, such as the free exercise of religion, and that restrictions to a fundamental right must be strictly scrutinized.  Agudath, 983 F.3d at 635-36; see also Roman Cath. Diocese, 141 S. Ct. at 66-67 (applying strict-scrutiny review to regulations that were found not to be neutral toward the free exercise of religion).  As Judge Crotty has discussed in detail, however, Jacobson remains binding upon courts reviewing the actions of state and local officials that do not infringe a fundamental right.  Hopkins Hawley LLC v. Cuomo, 518 F. Supp. 3d 705, 710-13 (S.D.N.Y. 2021).  This Court is persuaded by Judge Crotty's thorough and detailed discussion of Jacobson.

individuals in close contact in enclosed spaces to avoid the spread of the virus.").  Plaintiffs

assert that defendants were arbitrary in drawing a distinction between "essential" and "non-

essential" businesses.  (Compl't ¶¶ 78-101.)  However, as Judge Cogan explained in <u>Columbus</u>

<u>Ale House</u>, "[i]n this pandemic, regulating to protect public health is fraught with medical and

scientific uncertainty," and there is room for reasonable policy disagreements about the efficacy

of official actions.  495 F. Supp. 3d at 93.  The Complaint describes plaintiffs' disagreement with

defendants' restrictions, but it does not plausibly allege that the measures lacked a real and

substantial relationship to the goal of containing the virus.

       The Complaint also fails to plausibly allege governmental conduct that "shocks

the conscience."  Substantive due process "prevents the government from engaging in conduct

that 'shocks the conscience' . . . ."  <u>United States v. Salerno</u>, 481 U.S. 739, 746 (1987); <u>see also</u>

<u>Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y.</u>, 660 F.3d 612, 626 (2d Cir. 2011)

("Substantive due process protects against government action that is arbitrary, conscience-

shocking, or oppressive in a constitutional sense, but not against government action that is

incorrect or ill advised.") (quoting <u>Kaluczky v. City of White Plains</u>, 57 F.3d 202, 211 (2d Cir.

1995)).  Substantive due process affords "protection of the individual against arbitrary action of

government," but "only the most egregious official conduct can be said to be arbitrary in the

constitutional sense," such that "the cognizable level of executive abuse of power [i]s that which

shocks the conscience."  <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1998).  "[C]onduct

intended to injure in some way unjustifiable by any government interest is the sort of official

action most likely to rise to the conscience-shocking level."  <u>Id.</u> at 849.

       Plaintiffs have identified policies that they consider ill-advised, but not conduct so

egregious that it shocks the conscience.  <u>See Hopkins Hawley</u>, 518 F. Supp. 3d at 715 (assertion

that business restrictions lacked scientific support "simply do not satisfy the high bar that is the 'shock the conscience' standard."); cf. Maniscalco v. New York City Dep't of Educ., 2021 WL 4344267, at *3 (E.D.N.Y. Sept. 23, 2021) (mandate requiring educators to take FDA-approved vaccine does not shock the conscience) (Cogan, J.).

The motion to dismiss plaintiffs' due process claim will therefore be granted.

C.   The Complaint Does Not Plausibly Allege an Equal Protection Claim.

Count Four asserts that the distinctions drawn between "essential" and "non-essential" businesses violated the Equal Protection rights guaranteed by the Fourteenth Amendment, and asserts that the use of the two categories was political, arbitrary and irrational. (Compl't ¶¶ 193-205.)  Count Five brings an Equal Protection claim under Article I, section 11 of the New York Constitution on the same grounds.  (Compl't ¶¶ 206-10.)

As a threshold matter, plaintiffs have not plausibly alleged that they were injured based on a distinction between "essential" and "non-essential" businesses.  As noted, State Order 202.6, which was enforced by the City, classified bars and restaurants as "essential retail."  It is true that bars and restaurants were constrained from providing indoor food service, but the Complaint does not allege that this restriction related to a business's classification as essential or non-essential.  Further, State Order 202.6 issued on March 18, 2020, but Murdered by the Mob alleges that it closed on March 14 and The Way Station alleges that it closed on March 17. (Compl't ¶¶ 48, 50, 78.)  Though defendants have not raised the issue, the Court is skeptical that plaintiffs, as "essential" businesses, have identified an injury in fact that confers Article III standing to allege the deprivation of Equal Protection based on the purportedly disfavored treatment of non-essential businesses.  See, e.g., Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir. 2006) ("To meet the Article III standing requirement, a plaintiff must have suffered

an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the

challenged action; and the injury must be likely redressable by a favorable decision.").

Even if the plaintiffs have alleged an injury in fact, the Complaint does not

plausibly allege a violation of the Equal Protection clause.  As summarized by Judge Cote in Our

Wicked Lady:

> The Equal Protection Clause of the Fourteenth Amendment states that "no state shall deny to any person within its jurisdiction the Equal Protection of the laws." U.S. Const. Amend. XIV.  The Equal Protection Clause "embodies a general rule that States must treat like cases alike, but may treat unlike cases accordingly."  Winston v. City of Syracuse, 887 F.3d 553, 560 (2d Cir. 2018) (quoting Vacco v. Quill, 521 U.S. 793, 799 (1997)).  "If a law neither burdens a fundamental right nor targets a suspect class, [courts] will uphold the legislative classification so long as it bears a rational relation to some legitimate end."  Id. (citation omitted).  "The party attacking a classification's rationality bears the burden to [negate] every conceivable basis which might support it."  Spavone v. New York State Dep't of Corr. Servs., 719 F.3d 127, 136 (2d Cir. 2013) (citation omitted).

2021 WL 915033, at *6.

Plaintiffs' Equal Protection claim asserts that the defendants' actions interfered

with their fundamental rights to pursue a lawful profession and to make economically viable use

of real property, and that the defendants' actions should therefore be reviewed under the strict

scrutiny standard.  (Compl't ¶¶ 202-05.)  For the reasons previously explained, the Complaint

does not plausibly allege an abridgement of those fundamental rights.  Strict scrutiny review

therefore does not apply to plaintiffs' claims.

The Complaint separately asserts that the distinction between essential and non-

essential businesses was arbitrary and irrational.  (Compl't ¶¶ 196-201.)  It notes that liquor

stores and restaurants were both deemed "essential," but that restaurants were not permitted to

provide the type of on-premise services allowed for other businesses.  (Compl't ¶¶ 198-99.)

Plaintiffs assert that the restrictions placed on their businesses were not rationally related to

curtailing the spread of Covid-19.  (Compl't ¶ 200.)  However, as other courts have observed, officials had a reasonable basis to place restrictions on bars and restaurants that were not in place for other types of commerce.  Columbus Ale House, 495 F. Supp. 3d at 93 ("Diners cannot wear masks while they eat and drink, and indoor dining necessarily brings individuals from different households together in a restaurant, even if at a distance.  Thus, indoor dining poses a greater risk of virus transmission than many other activities."); cf. Luke's Catering Serv., LLC v. Cuomo, 485 F. Supp. 3d 369, 383–84 (W.D.N.Y. 2020) (defendants did not unreasonably classify banquet halls differently than restaurants because banquet halls "do not provide the same essential food service as restaurants" and presented a higher risk of "individuals congregating and mingling at large, private gatherings . . . .").  As noted, the party asserting the irrationality of a classification has the burden to negate every reasonable basis that supports the classification. Spavone, 719 F.3d at 136.  Plaintiffs' allegations about the purportedly irrational and arbitrary character of defendants' restrictions are legal conclusions and do not plausibly allege an Equal Protection claim.

   Counts Four and Five will therefore be dismissed.

CONCLUSION

   Defendants' motions to dismiss are GRANTED.  The Clerk is directed to terminate the motions and the related letter-motion.  (Docket # 26, 32, 34.)  The Clerk is directed to amend the caption as indicated above, close the case and enter judgment for the defendants.

   SO ORDERED.

_____

P. Kevin Castel

United States District Judge

Dated:  New York, New York
   October 21, 2021